Peter J. BRENNAN, Secretary of Labor, United States Department of Labor, Appellant-Cross-Appellee,

v.

MAXEY'S YAMAHA, INC., et al., Appellee-Cross-Appellant.

Nos. 74–1354, 74–1478.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 8, 1975.

Decided March 26, 1975.

Sylvia S. Ellison, Atty., U. S. Dept. of Labor, Washington, D. C., for Secretary of Labor.

John J. Respeliers, Omaha, Neb., for Maxey's Yamaha.

Before GIBSON, Chief Judge, and HEANEY, and ROSS, Circuit Judges.

GIBSON, Chief Judge.

The Secretary of Labor brought this action to enjoin alleged violations of the Fair Labor Standards Act of 1938, as amended (FLSA), 29 U.S.C. § 201 et seq., including the withholding of overtime compensation due to employees of Maxey's Yamaha, Inc., a Nebraska corporation engaged in retail sales and service of motorcycles. Both parties appeal portions of the District Court's March 13, 1974, order denying the Secretary's requested injunction with respect to all but one of Maxey's various alleged violations of the Act.[1] As to the remaining violation, the court enjoined Maxey's from withholding $1,708.54 in overtime compensation denied Donald Holub as a result of his misclassification under the Act as an exempt executive or administrative employee.

On appeal the Secretary challenges (1) the trial court's finding that another Maxey's employee, Judith Holman, was not discharged in violation of 29 U.S.C. § 215(a)(3) for asserting her rights under the Act, and (2) the trial court's omission of prejudgment interest from its award of unpaid overtime compensation to Holub. On cross-appeal Maxey's asserts that under 29 U.S.C. § 213(b)(10) Holub is exempt from the maximum hour provisions of the Act because he is a "mechanic primarily engaged in selling or servicing automobiles." We reverse the trial court's finding that Judith Holman's discharge was nondiscriminatory and its denial of prejudgment interest.

I. *Discriminatory Discharge.*

The Act[2] prohibits discrimination against an employee who asserts or threatens to assert his or her FLSA rights. The Secretary charged Maxey's with having discriminatorily discharged Holman, an office worker, on July 28, 1972, because of her assertion of rights under the Act.

The discharge followed a 1972 investigation by the Department of Labor which disclosed minimum wage and maximum hour violations with regard to nine of Maxey's employees. At the Government's request, Maxey's promptly agreed to pay its employees all back wages found to be due and issued a check to each along with scheduled July 28 paychecks. At least five of the nine workers, however, were asked to endorse their back wage checks back to Maxey's and to sign wage receipt forms without actually receiving and retaining the check proceeds. Apparently these amounts were treated as loans to the company and later repaid.

The Secretary urges that the discharge of Holman by Maxey's president and sole owner, Mr. McBride,[3] was discriminatory because it was prompted by Holman's complaint that her rights under the FLSA were being violated. McBride admitted that before July 28 he had no intention to fire Holman, but decided to

---

1. The Secretary alleged that Maxey's violated the provisions governing minimum wages, §§ 206(b) and 215(a)(2); overtime compensation, §§ 207(a)(2) and 215(a)(2); record keeping, §§ 211(c) and 215(a)(5); discriminatory discharges, § 215(a)(3); and false reporting, §§ 211(c) and 215(a)(5).

2. 29 U.S.C. § 215(a)(3). That section reads:

§ 215. Prohibited acts, prima facie evidence
(a) [I]t shall be unlawful for any person—

\* \* \* \* \* \*

(3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee[.]

3. At the time of Holman's discharge McBride owned 100% of the stock of Maxey's Yamaha, Inc. Later, prior to trial, however, all shares of stock in Maxey's Yamaha, Inc., were purchased by a successor corporation, Maxey's, Inc., owned by some of the former employees and another individual.

do so after a July 28 outburst following her refusal to take part in what she thought was an unlawful scheme. Although Maxey's argues that Holman was legitimately discharged because of unsatisfactory job performance and overall emotional conduct, it appears unrefuted that the check endorsement scheme, as Holman believed it to exist, was a patent violation of the Act and the immediate cause of her July 28 outburst.

■ Where the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights, the discharge is discriminatory under § 215(a)(3) whether or not other grounds for discharge exist. Goldberg v. Bama Manufacturing Corp., 302 F.2d 152 (5th Cir. 1962); Mitchell v. Goodyear Tire & Rubber Co., 278 F.2d 562 (8th Cir. 1960). In the *Mitchell* case we reversed as clearly erroneous the trial court's finding that an employee's discharge was unrelated to his mailing a letter of complaint to the Wage and Hour Division of the Department of Labor a few days earlier. On the contrary, the record revealed that although a few days before his wage-hour complaint he had been scheduled for future discharge, he would not have been discharged at that particular time but for his admission of authorship of the letter. Similarly, in *Goldberg* the Fifth Circuit remanded the trial court's refusal to grant reimbursement of lost wages to an employee who could have, and in the court's opinion, "probably ought" to have been fired for half a dozen reasons, where the firing was motivated in part by the assertion of her statutory rights. 302 F.2d at 153. In the instant case, however, Holman was not scheduled for discharge and had not been advised that McBride or any person with hiring authority considered her work unsatisfactory.

Holman's protest of what she believed to be unlawful conduct on Maxey's part was an act protected from reprisals and rendered her firing discriminatory regardless of the existence of other grounds for her discharge. As in Wirtz v. Ross Packaging Co., 367 F.2d 549 (5th Cir. 1966), she insisted on receiving and retaining her back wage check before signing her receipt and was promptly dismissed. Her discharge was a direct result of her insistence upon receiving retroactive benefits required under the Act. That a scheme was proved to exist in *Wirtz* but only believed to exist in the instant case does not deny Holman a remedy. Her reasonable belief was caused entirely by Maxey's conduct, and her lawful assertion of rights based on that belief must be protected. To hold otherwise would defeat the Act's purpose in § 215(a)(3) of preventing employees' attempts to secure their rights under the Act from taking on the character of "a calculated risk." Mitchell v. Robert De-Mario Jewelry, Inc., 361 U.S. 288, 293, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960).

Three witnesses to the July 28 incident, McBride, Holman, and Mr. Rupiper, the company bookkeeper, testified as to the facts surrounding Holman's discharge. Holman testified that she first learned she was entitled to back wages on the morning of July 28 when she overheard McBride tell Rupiper to issue back wage checks to the employees from one account, to have the employees endorse them and sign government wage receipts, and then to deposit the checks in Maxey's account in another bank.[4] She voiced her disapproval at the time, but to no avail.[5] McBride then left and Rupiper presented a back wage check in the amount of $110.63 and a blank receipt to Holman, asking her to endorse

---

**4.** On direct examination Holman reported that on July 28 McBride told Rupiper to draw "the checks from one checking account, to have the check[s] and the releases endorsed, not telling the employees exactly what they were for, and then [to deposit] these checks * * * in another checking account."

**5.** On direct examination Holman was asked whether she voiced her disapproval immedi-

ately upon overhearing McBride's conversation with Rupiper:

A. Yes, I did. I told them that it was illegal, that it was wrong, and if they would happen to be caught that they would be in serious trouble, but Mr. McBride said to me that if I didn't say anything, no one would find out.

both without receiving any money.[6] She refused. That afternoon McBride returned and in a private conversation in his office purportedly told Holman she would be fired if she did not sign.[7] She then signed, received her check, and was discharged.

McBride testified to two conversations with Holman on July 28. The first, in the morning, occurred just after he learned of the Government's determination that back wages were due Maxey's employees. McBride admitted that he was displeased with having to pay back wages. This is understandable as is his reaction that the overtime back wages might not be merited. But the Government ordered the wages paid. If McBride wanted to contest the order, he was free to do so; otherwise he should have made payment without giving with one hand and taking back with the other. This does not mean that legitimate loans between the company and the employees could not have been mutually agreed upon. But in Holman's case there was no agreement. When McBride returned later that afternoon, Holman was still upset. He talked with her privately in his office and reportedly tried to calm her in order to explain why she was being paid the back wages, but she was out of control. Finally, because of her continuing outburst, McBride discharged her.[8] McBride denied having personally ordered her to endorse the check and receipt without being paid.

Rupiper testified that he presented the check and receipt to Holman the morning of July 28. He admitted commenting to her that she did not deserve the money—suggesting that she should endorse the check back to the company—but he denied ordering her to do so.[9]

The District Court's finding that there was no scheme to deprive employees of their back overtime wages appears correct. The three employees who were owed the greatest amounts ended up as part owners of the business; however, the manner in which the back wage payments were discussed and presented to Holman did appear highly suspect and could readily have been viewed by her as a scheme to circumvent the Act. Many of the employees felt similarly about the pay-back or lend-back angle. Even Rupiper admitted that he understood why Holman felt cheated. Under these circumstances it was incumbent upon the employer to promptly and effectively dispel and correct any coercive atmosphere or erroneous impression that its tactics in issuing the checks and requesting an endorsement back to the company

6. On direct examination Holman was asked:
> Q. Did Mr. Rupiper ask you to sign a receipt and endorse the check without actually receiving the money?
> A. Yes, he did.

7. On direct examination relating to her July 28 conversation with McBride, Holman was asked:
> Q. What did he tell you at that time?
> A. He asked me why I would not sign the release and check. I told him again that I didn't approve of the tactics he was using, and he said that if I didn't sign it, I could seek employment elsewhere, and I said, "If I do sign, I will take the check with me," which I did.
> Q. Subsequently to that conference, you were paid back wages?
> A. Yes, I was paid the back wages, my regular salary, and I obtained a copy of the receipt.

8. On direct examination McBride described Holman's final dismissal:
> Q. Do you recall the actual termination?
> A. I remember something about her not wanting to sign for the check * * *. She was hollering about quitting, and to be quite truthful, it just got to the point where I couldn't take it much more, and I told her she didn't have to quit; she was fired.

9. On cross-examination Rupiper was asked:
> Q. You did offer her her check and she refused to take it? Is that what you are saying?
> A. I offered it to her, and I felt that she did not deserve it; that she did not work 40 hours.
> Q. In fact, you told her that since you felt she didn't deserve it that she should sign it over back to Maxey's, is that right?
> A. I mentioned that. I didn't tell her that is what had to be done, but I did say, "I don't think you deserve the check. I think it should go back to Maxey's."

might have formed in the minds of the employees. It appears that the company did not have sufficient funds to cover the back wage checks. The company should therefore have leveled with the employees and reached a mutually satisfactory arrangement on paying the back amounts. This it apparently did with most of its employees but not with Holman.

█ While on appeal we do not try a case *de novo* and we give great weight and deference to trial court factual findings, we are convinced that the District Court's finding that discrimination played no part in Holman's discharge is clearly erroneous and must be set aside. Rule 52(a), Fed.R.Civ.P. The whole episode resulted from Maxey's violation of the Act coupled with its ill-devised method of facial compliance.

Certainly the court cannot place its imprimatur on these coercive tactics. While some employees cashed their checks at Maxey's, voluntarily loaned the cash directly back to the company, and apparently ended up owning part of the business, Holman was given no unfettered choice. While Holman's outburst and emotional conduct apparently played a role in her discharge, she did have a clear right to protest the antics and tactics employed by Maxey's in complying with the Act's demands. Maxey's tactics precipitated the incident which Maxey's uses as a basis for her discharge. Since Holman's interpretation, although erroneous, was reasonable, the fault lies with Maxey's in not handling the Government-ordered payments in a proper manner. Holman therefore should be compensated for the loss in wages she suffered as a result of her unlawful dismissal.

II. *Prejudgment Interest.*

█ The Secretary challenges the District Court's omission of prejudgment interest on the award of $1,708.54 representing unpaid overtime compensation due Mr. Holub. Although the Secretary demanded interest in his complaint, the trial court awarded none. The defend-

ant contends it in good faith withheld the overtime wages because it considered Holub exempt under the Act as an executive or administrative employee. Good faith withholding by the employer, however, is no justification for penalizing the employee by denying prejudgment interest. Brennan v. City Stores, Inc., 479 F.2d 235, 241–42 (5th Cir. 1973); Hodgson v. Daisy Manufacturing Co., 445 F.2d 823 (8th Cir. 1971). Although there was a dispute as to the precise number of hours worked by Holub for the periods in question, the employer's breach of its duty to maintain adequate employment records is not an equitable basis for penalizing the employee. *Cf.* Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–88, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946).

█ Because the trial court in its memorandum opinion intimated no specific reason for denying the interest, we apply the general rule governing injunction proceedings under 29 U.S.C. § 217 and award the interest in line with the basic remedial policy of the FLSA. In this circumstance the employer, Maxey's was unjustly enriched at the expense of the employee, Holub. Hodgson v. American Can Co., 440 F.2d 916, 922 (8th Cir. 1971). Interest on the underpayments should thus be awarded to the employee from the respective dates the wages became due. Hodgson v. Daisy Manufacturing Co., *supra*, 445 F.2d at 824–25.

III. *The Exemption Under Section 213(b)(10).*

Finally, in its cross-appeal, relying on Shultz v. Louisiana Trailer Sales, Inc., 428 F.2d 61 (5th Cir.), cert. denied, 400 U.S. 902, 91 S.Ct. 139, 27 L.Ed.2d 139 (1970), Maxey's argues for the first time in these proceedings that the District Court's finding that Holub was *not* an exempt executive or administrative employee under the Act in turn compels a finding that he *is* exempt under § 213(b)(10). That provision, as amended in 1966, states:

§ 213. *Exemptions*

\*    \*    \*    \*    \*    \*

**184**

(b) The [maximum hour] provisions of * * * this title shall not apply with respect to—

\* \* \* \* \* \*

(10) Any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trailers, trucks, farm implements, or aircraft if employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles to ultimate purchasers[.] [10]

Maxey's argues that the District Court's now uncontested finding that Holub spent more than fifty percent of his time doing actual repair work leads to the conclusion that he was primarily a mechanic, and that because a motorcycle dealership is not distinguishable from an automobile dealership, Holub is exempt under § 213(b)(10).

■ While Maxey's contention that motorcycles are generically akin to automobiles has some logic to commend it, we are foreclosed from considering it because it was not raised below. Mitchell v. Williams, 420 F.2d 67, 68 n. 2 (8th Cir. 1969); Mid-Continent Petroleum Corp. v. Keen, 157 F.2d 310, 315 (8th Cir. 1946).

The judgment of the District Court is reversed and the cause remanded for entry of judgment in accordance with this opinion. Judith Holman is to receive damages in the appropriate amount for lost wages resulting from her discriminatory discharge, and Donald Holub is to receive prejudgment interest on the amounts of underpaid overtime compensation from the dates the wages became due. In all other respects the judgment of the District Court is affirmed.

Costs of this appeal are to be taxed against Maxey's.

ROSS, Circuit Judge (dissenting).

This is an extremely close case, but because the trial court had the best opportunity to view the witnesses and judge their credibility, I would defer to

his determination that discrimination played no part in Holman's discharge. I concur in Parts II and III of Judge Gibson's opinion.

---

**10.** After entry of the District Court's order, the statute was altered once again in the Fair Labor Standards Amendments of 1974, Pub.L. No. 93–259, § 14 (Apr. 8, 1974).