Peter J. BRENNAN, Secretary of Labor, U. S. Department of Labor

v.

BRASWELL MOTOR FREIGHT LINES, INC., a corporation.

No. CA 3–6915–C.

United States District Court, N. D. Texas, Dallas Division. June 18, 1975.

705

———◆———

Richard Collier, Atty., U. S. Dept. of Labor, Dallas, Tex., for plaintiff.

Hugh M. Smith, Schoolfield & Smith, Dallas, Tex., for defendant.

## OPINION

WILLIAM M. TAYLOR, Jr., Chief Judge.

On July 26, 1972, the Secretary of Labor filed suit against the defendant herein, Braswell Motor Freight Lines, Inc. (Braswell), alleging violations of sections 6(d)(1) and 15(a)(2) of the Fair Labor Standards Act of 1938, as amended.[1] Specifically, the Secretary claimed that Braswell failed to pay certain of its female employees at a rate equal to that of male employees performing the same or similar services for Braswell.

This case was tried on October 19, 1972, in the United States District Court for the Northern District of Texas, Dallas Division.[2] At this trial, two of the defendant's female employees, Nellie Whaley and Betty Dwyer, testified on behalf of the Secretary of Labor.[3]

On October 20, 1972, the day after the trial, Ms. Whaley, who was employed as a dispatcher, was notified by Braswell that her hours of employment were being reduced from eight to five hours per day. This cut was effective on the succeeding Monday.

On May 1, 1973, after Braswell's Chief Dispatcher had been terminated, the Terminal Manager requested Ms. Whaley to assume the Chief Dispatcher's duties until a replacement could be hired. Ms. Whaley did as requested and worked in excess of eight hours per day from May 1 to approximately May 15, 1973, when her hours were reduced to five and one-half compensable hours per day.

On June 24, 1973, Nellie Whaley's hours of employment were raised to seven and one-half compensable hours per day, and on September 15, 1973, her hours were increased to eight per day. On December 21, 1973, Ms. Whaley was laid off and was not subsequently recalled.

Betty Dwyer was employed by Braswell as a claims investigator. The Secretary alleges that Ms. Dwyer was the victim of a post-trial campaign of harassment conducted by the defendant. It is further claimed that the goal of this campaign was to compel Ms. Dwyer's resignation.

Ms. Dwyer maintained that the harassment commenced in early January of 1973. She claimed this harassment took varied forms. Duties[4] previously performed by her were assigned to other employees. The radius of her work area was reduced.[5] Ms. Dwyer was also persistently confronted with errors in her work.

Commencing in February of 1973, Ms. Dwyer was warned and counselled, on various occasions, concerning errors in her claims investigation work. Most of the errors involved either her failure to take discounts on claims or her failure to promptly process claims. Ms. Dwyer contends that the errors were either of a type which had previously gone unnoticed, were not her fault, or were so insignificant that they did not warrant disciplinary action.

1. 29 U.S.C. § 201 *et seq.*

2. The case was tried before the Honorable Sarah T. Hughes.

3. On October 30, 1972, judgment was entered finding that said Nellie Whaley and Betty Dwyer had not been paid wages equal to those being paid to male employees performing the same or similar tasks and enjoining Braswell from violating section 15(a)(2) of the Fair Labor Standards Act of 1938, as amended. *Hodgson v. Braswell Motor Freight Lines, Inc.*, No. CA 3–6120–B (N.D.Tex. Oct. 30, 1972).

4. Opening mail, tracer investigations, and general office filing.

5. No unwarranted trips to other departments, the dead-file room, and the restroom. Also, Ms. Dwyer claims that her access to the company's telephones was severely restricted.

On February 7, 1973, Betty Dwyer was issued a letter reprimanding her for errors in her work. On April 13, 1973, Ms. Dwyer was issued another letter reprimanding her for errors in her work and imposing a two-day disciplinary suspension from work. On May 22, 1973, she received a similar letter of reprimand, which imposed a three-day disciplinary suspension.

This alleged harassment culminated with Ms. Dwyer's resignation, which was effective June 1, 1973. Ms. Dwyer contends her resignation was precipitated by a conversation she claimed to have had with Mr. George Logan, a Braswell officer, in late May of 1973. Mr. Logan purportedly told Ms. Dwyer that the harassment would continue until Ms. Dwyer resigned.

On March 9, 1973, the Secretary filed this suit on behalf of Nellie Whaley and Betty Dwyer alleging that Braswell had violated section 15(a)(3) of the Fair Labor Standards Act, as amended. Section 15(a)(3) makes it unlawful for an employer covered by the Act—

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act . . . ..

The Secretary contends that because of their participation in the 1972 suit Nellie Whaley and Betty Dwyer's were discriminated against by Braswell. Such discrimination is alleged to have resulted in Ms. Whaley's permanent layoff and in Ms. Dwyer's forced resignation.

█ When the immediate cause of either the discriminatory treatment or the discharge of an employee was the assertion of a statutory right under .the Fair Labor Standards Act, such treatment or discharge is prohibited by section 15(a)(3). *Goldberg v. Bama Manufacturing Corp.*, 302 F.2d 152 (5th Cir. 1962). Thus as to Ms. Whaley, the Court must determine whether the motivating factor for her reduction in working hours and eventual lay-off was her participation in the Department of Labor suit tried before Judge Hughes in 1972. As to Ms. Dwyer, the Court is presented the threshold issue of whether Ms. Dwyer was, indeed, the victim of discriminatory or retaliatory treatment, proscribed by section 15(a)(3). After close consideration, I must conclude that the Secretary's evidence as to each issue is too tenuous, and therefore both issues must be answered negatively.

## I. *Betty Dwyer*

Section 15(a)(3) violations involve discriminatory treatment of an employee in retaliation for said employee's exercise of his or her rights. As to Betty Dwyer, I am unconvinced that she was, indeed, the victim of any discriminatory treatment regardless of its motivating cause. An analysis of the alleged campaign of harassment against Ms. Dwyer does not expose a continuum of conduct on behalf of Braswell calculated to treat Ms. Dwyer differently than her fellow employees.

Ms. Dwyer's mail-opening duties were curtailed because her supervisor was instructed by the Braswell management that the review of incoming mail was a task to be performed by the Claims Agent. This appears to be a reasonable measure intended to keep the department head aware of just what his department was doing. Tracer investigations and some general office filing were removed from the claims investigators' responsibility so that they could devote more of their energies to claims investigation. After March of. 1972, the staff of the claims investigation department was reduced from four to three. To facilitate the reduction in force, Ms. Dwyer's supervisor felt it was necessary to transfer a portion of the department's more menial workload to lesser-paid file clerks.

Ms. Dwyer's complaints about her shrinking work area must have been

shared by her fellow employees because the restrictions complained of were applied across the board. Employees from Ms. Dwyer's general office were prohibited access to the local office because management was attempting both to encourage written communication between the two offices and to prevent union contact.[6] Ms. Dwyer was refused access to the dead-file room because the operation of that room was the responsibility of certain lower-paid file clerks.

The only evidence adduced of restroom restrictions discriminatorily directed toward Ms. Dwyer was her own testimony. This testimony was countered by a denial of such restrictions by her supervisor. I must accept the latter's account as both more plausible and credible.

Braswell company policy strictly limited *all* employees' use of company telephones. Ms. Dwyer was not singular because of her limited-access to these telephones.

Ms. Dwyer claimed the harassment was largely in the form of reprimands for alleged errors in her claims investigation work. The errors centered mainly on Ms. Dwyer's persistent refusal to have customers take discounts on claims.[7] Ms. Dwyer and her fellow investigators were counselled to take advantage of such discounts by the Claims Agent. Ms. Dwyer's apparent disregard for such warnings resulted in two disciplinary suspensions.

The issue of Braswell's right to incentive discounts is not on trial here and the Court is hesitant to interfere with the defendant's business decision regarding such discounts. Braswell's discount policy appears reasonable and disciplinary action for the failure to honor such policy appears equally reasonable. Ms. Dwyer was presented with two viable alternatives: she could either follow company policy or she could process a union grievance if she felt any disciplinary action dealt to her was unfair or unwarranted. She took neither option, but instead chose to resign.

■ Finally, there is the conversation which Ms. Dwyer claimed to have had with George Logan, then a Braswell Vice-President. Ms. Dwyer testified that this conversation precipitated her resignation.[8] Unfortunately, George Logan died between the time of the alleged conversation and the trial of the instant case.[9] The defendant's witnesses [10] por-

---

6. Different labor unions represented the general office and local office employees.

7. In her trial testimony Ms. Dwyer claimed that carriers such as Braswell neither take nor are entitled to take such incentive discounts.

8. Q. Did you ever talk to anyone out at Braswell about this treatment?
   A. Yes, sir.
   Q. Who did you talk to?
   A. George Logan.
   Q. Who was George Logan?
   A. He was Vice-President of the Company.
   Q. What did you talk to Mr. Logan about?
   A. Whether or not Braswell wanted my resignation and whether or not the harassment would stop.
   Q. Did Logan say anything?
   A. He said the harassment would not stop because they wanted my resignation. He said he was sorry, but it would not stop.

9. This testimony is admissible under Rule 804 of the Federal Rules of Evidence, 28 U.S.C. § 2076, which provides:
   (a) Definition of unavailability. "Unavailability as a witness" includes situations in which the declarant—
   \*   \*   \*   \*   \*
   (4) is unable to be present or to testify at the hearing because of death
   \*   \*   \*   \*   \*
   (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
   \*   \*   \*   \*   \*
   (3) Statement against interest. A statement which was at the time of its making so far. contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.

10. The Braswell comptroller and an attorney who had represented Braswell in many of its labor relations conflicts.

trayed George Logan as a skilled and experienced labor relations manager who was most familiar with the requirements of the Fair Labor Standards Act. Neither witness was of the opinion that the alleged conversation could have been attributed to Mr. Logan. The Court shares this opinion. I do not believe that a skilled labor relations manager familiar with the Fair Labor Standards Act would make remarks which were so patently against his interest.

■ The Court cannot conclude that Betty Dwyer was the victim of discriminatory treatment by the defendant.

## II. *Nellie Whaley*

Was the motivating factor for Ms. Whaley's post-trial reduction on compensable working hours and eventual lay-off her testimony before Judge Hughes? The resolution of this issue turns on whether the Secretary has sustained his burden of proving a section 15(a)(3) violation. The Court does not believe that he has.

■ The Secretary's evidence showing Ms. Whaley's post-trial reduction in working hours and lay-off certainly establishes a prima facie case for a section 15(a)(3) violation. But, when weighed against evidence presented by the defendant, the Secretary's case fails to prove such a violation by a preponderance of the evidence.[11]

Prior to 1972, Braswell's operations from El Paso, Texas, eastward, were non-union. However, union contracts between Braswell and the Teamsters Union and the Office and Professional Employees International Union became effective in January and February of 1972, respectively. These union contracts governed the wages, hours, and working conditions of the bulk of the Braswell labor force.[12]

■ The immediate effect of the defendant's operation under these union contracts was a skyrocketing cost of labor. Uncontradicted trial testimony established that the labor contracts resulted in the average hourly wage, paid to Braswell employees, being increased by approximately $2.50 per hour. This increase in cost of operation necessitated a program of cost reduction. To effect such a program, employee work-hour reductions[13] and lay-offs were required. These personnel actions were the result of a management program aimed at cost-cutting. No evidence was presented tending to prove such actions taken with the intent to discriminate against certain employees, except for the inference arising from the timing of Nellie Whaley's reduction in working hours. This inference does not carry the burden in view of the defendant's post-1972 financial situation.[14] Against this background, I cannot conclude that the actions taken with regard to Ms. Whaley were motivated by her participation in the Secretary's lawsuit before Judge Hughes.

Defendant's attorney is requested to prepare and submit appropriate form of judgment.

11. Violations of the Fair Labor Standards Act must be proved by a preponderance of the evidence. See *Mornford v. Andrews*, 151 F.2d 511 (5th Cir. 1945).

12. Neither collective bargaining agreement covered the dispatchers in the Dallas terminal.

13. Under the 1972 labor agreements union employees were susceptible to lay-off but not work-hour reductions. Any attempt by Braswell to economize via hour reductions had to involve non-union personnel, i.e., dispatchers.

14. Before the labor contracts took effect in 1972, the Braswell labor force numbered approximately 1000. In January of 1973 it had diminished to approximately 825 and, at the date of this trial, it had dwindled to approximately 525.