**David M. HAYES, Plaintiff,**

v.

**Russell McINTOSH; Joan McIntosh; and McIntosh Energy Company, Defendants.**

**Civ. No. F 80–236.**

United States District Court, N.D. Indiana, Fort Wayne Division.

Jan. 11, 1984.

Frank A. Webster, Fort Wayne, Ind., Larry J. Burke, Fort Wayne, Ind., for plaintiff.

Thomas S. Locke, Fort Wayne, Ind., for defendants.

## MEMORANDUM AND ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court for a decision on the merits following a bench trial. Plaintiff brought this action alleging wrongful discharge or discrimination under 29 U.S.C. § 215, *et seq.* This court having considered the entire record and being duly advised, hereby renders and enters the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### Findings of Fact

1. This is a statutory action for wrongful discharge or discrimination under 29 U.S.C. § 215(a)(3). Plaintiff, David M. Hayes, was a full time employee of defendant McIntosh Energy Company.

2. Plaintiff is an experienced and trained semi-truck driver.[1] In late December 1976 plaintiff was offered a position by defendant McIntosh Energy Company. His actual employment with that firm began on or about January 2, 1977.

3. The three defendants consist of one corporation and two individuals. Defendant Russell McIntosh has been the primary owner and/or operator of McIntosh Energy and its predecessor entities,[2] for the past thirty years. Defendant Joan McIntosh is defendant Russell McIntosh's wife. Her involvement with McIntosh Energy Company up until 1978 consisted of occasional help with the bookkeeping, and since that time Joan McIntosh has had no direct contact with the workings of McIntosh Energy.[3] Defendant McIntosh Energy Company is a proprietorship owned by Russell McIntosh and is engaged in the business of selling gasoline, oil, lubricants and related products on both the wholesale and retail level.

4. During all relevant times, the principal place of business of defendant Russell McIntosh and defendant McIntosh Energy Company was located at 3910 Northrop Avenue, Fort Wayne, Indiana. That site was a "tank farm" consisting of several storage tanks for various "Union 76" brand fuels. Out of that facility operated one semi-tractor trailer and two self-contained fuel trucks as well as a van. From that location, the employees could service the accounts of McIntosh Energy Company which consisted of various independent gasoline dealers and at least two convenience markets which were subsidiaries of McIntosh Energy Company.

5. During his employment at McIntosh Energy Company, plaintiff's job consisted primarily of driving a tractor trailer to deliver fuel oil and gas to the various business accounts of defendant McIntosh Energy in the Fort Wayne and Huntington, Indiana area. When plaintiff was not driving the semi-truck, he engaged in other work such as removing gasoline pumps and installing new pumps at different service stations; doing minor mechanical repairs and maintenance work on various vehicles owned by defendant McIntosh Energy Company; and general maintenance work

---

**1.** Plaintiff's experience in the truck driving field went back as far as the Korean War when he was a dispatcher for nine "trucking companies" each of which was comprised of twenty-one trucks. During his nine years in the service he was a truck driver or involved in similar activity for six years. In 1974 he received training from Ryder Trucks and received his Department of Transportation certificate after completing a training course at North American Van Lines.

**2.** McIntosh Energy Company was incorporated in June of 1981 and prior to that time had been a sole proprietorship operating under the name of McIntosh Oil Company. See notes 19 and 22 *infra.*

**3.** At the time of trial, Joan McIntosh was secretary to the personnel manager of the Allen County Public Library.

on defendants' premises including lawn mowing and, on at least one occasion, paneling the offices of defendant McIntosh Energy Company.

6. While employed at McIntosh Energy Company, plaintiff's hours were long and flexible—often beginning in the early hours of the morning and continuing until 10:00 or 11:00 p.m. On only one occasion during his tenure with that company did defendant work less than forty hours during a given work week. As compensation, plaintiff was paid on a "per load" basis for the time spent driving the semi-truck and on an hourly basis for all non-truck driving work time.[4] At first, plaintiff was paid $13.00 for each "long trip" in the semi-truck; $10.00 for each short trip;[5] and $4.00 per hour for work which did not entail driving the transport. Later, and up until shortly before his departure, plaintiff received $22.00 per load[6] and $5.00 per hour for non-driving work. Combining the hours spent driving and the hours spent in non-driving work plaintiff was averaging $347.00 per week at the time he left the employ of McIntosh Energy Company.

7. In the early part of May 1980, the Wage and Hour Division of the Department of Labor instituted an investigation into the payment practices of defendant McIntosh Energy Company. The purpose of the investigation, precipitated by the complaint of an undisclosed source, was to determine whether or not McIntosh Energy Company was in compliance with the requirements of the Fair Labor Standards Act. The period encompassed within the scope of the investigation was from April 24, 1978 to April 24, 1980.

8. During the course of the investigation, Mr. Raymond Hoffman of the Wage and Hour Division of the United States Department of Labor interviewed plaintiff in the offices of defendant McIntosh Energy Company. The essence of the interview was reduced to a written statement which the plaintiff signed.

9. Based upon the interview and a review of the time sheets, it was determined that plaintiff was not being properly paid. Specifically, it was determined that defendant McIntosh Energy Company was not paying plaintiff and four other employees time and a half for all hours worked over forty hours per week.

10. As a result of defendants' failure to pay overtime, it was determined by the Wage and Hour personnel that plaintiff was entitled to $2,500.00[7] in back pay. On June 26, 1980, plaintiff received a check in that amount.

11. While the Wage and Hour investigation was in process plaintiff's wages were reduced from $22.00 per load to $18.00 per load so that the payment of overtime would not result in an increase in plaintiff's gross wages. It was further understood by the parties that plaintiff would receive a bonus each month so that his pay would equal $22.00 per load straight time.

12. Prior to plaintiff's actual receipt of the back pay check, defendant Russell McIntosh suggested on numerous occasions that the check should be returned to him or given to charity.[8] In fact, in the

---

4. For the first two days, plaintiff rode with another driver and for those two days he was paid $2.50 per hour. After two days it was determined that plaintiff was capable of managing the route by himself.

5. A "long" trip consisted of trips from Huntington, Indiana to Fort Wayne, Indiana while short trips entailed driving to and from McIntosh's place of business to the Gladieux Refinery in Fort Wayne.

6. In addition to the flat per load basis, plaintiff was paid $4.00 for each drop. Generally, the average trip lasted from three to four hours.

7. It was originally determined that plaintiff was entitled to an award of $2,724.00. After reconsidering the statute of limitations, it was determined that plaintiff was only entitled to $2,500.00.

8. Mrs. Arbogast, defendants' secretary, likewise testified that Russell McIntosh asked her, in the presence of plaintiff, what she would do were it determined that she was entitled to such an award. She indicated that she would probably keep the check.

course of a telephone conversation between plaintiff Hayes and defendant McIntosh, defendant reiterated that notion while Raymond Hoffman of the Wage and Hour Division of the Department of Labor was present in defendant's office. Upon overhearing defendant's suggestion that the money should be given to charity, Mr. Hoffman informed defendant that a back pay offer had to be a bona fide offer. At a later meeting, Mr. Hoffman counseled defendant from taking any retaliatory action against plaintiff Hayes as a result of the back pay award.

13. The record adequately supports and the court finds that defendant did in fact request that the plaintiff return the back pay check. Plaintiff did not, however, return the check.[9]

14. The day after plaintiff received the back pay check, his wages were cut to the minimum of $3.10 per hour. On that date, June 27, 1980, plaintiff received a pay check for the preceding week in an amount of $139.00 reflecting the minimum wage rate. Plaintiff objected because he had worked that week prior to being informed of the wage reduction. Upon his objection a new check was drawn up in the amount he had been receiving ($347.00). On the same date that the controversy surrounding the wage rate was brewing, defendant Russell McIntosh hired another driver.[10]

15. The wage reduction ostensibly occurred because of defendant Russell McIntosh's understanding that the minimum wage was all he had to pay his employees under the wage and hour laws. Given the timing of the reduction, the fact that defendant Russell McIntosh expected a "present", and the underlying circumstances, however, the court finds that the reduction resulted from plaintiff's refusal to turn over the back pay check and was done to retaliate for that refusal.

16. On June 28, 1980 defendant called plaintiff at home and offered plaintiff his job back at his regular rate of pay. Plaintiff accepted and further inquired into the possibility of taking his accrued vacation time since defendant had already hired another driver. The parties reached an agreement[11] and plaintiff went on vacation for approximately one and one-half weeks.

17. Upon his return from vacation, plaintiff was informed that his wages would be based upon a set rate of $5.00 per hour.[12] That wage would reduce plaintiff's rate of pay substantially. Plaintiff indicated his unwillingness to accept the reduction and was fired.[13]

18. After his termination, plaintiff made repeated efforts to secure employment.[14] On July 28, 1980 plaintiff went to

9. Aside from the episode with Mary Arbogast, and aside from plaintiff's own testimony, the record supports such a conclusion. In fact, Ray Miller, also a former employee of Russell McIntosh, testified that the same request was made of him. He too kept the check.

10. While all of this was going on, plaintiff told Russell McIntosh that he would call the Wage and Hour Division. Mr. McIntosh said that that would be fine and further offered to supply plaintiff with that agency's number.

11. While it makes little difference as far as the present matter is concerned, it should be noted that the exact return date was misunderstood by the parties. Plaintiff thought he was to return from vacation on Thursday, while defendant thought plaintiff was to return the previous Monday.

12. By paying plaintiff $5.00 per hour it was thought that plaintiff could work approximately the same amount of time and receive the same rate of pay without running afoul of the wages and hour laws. This was repeatedly referred to throughout trial as "Chinese Overtime."

13. The court recognizes that a dispute exists over why plaintiff left the employ of defendants and further recognizes that defendants claim that plaintiff decided that he no longer wished to do yard work. The court finds, however, that the real reason was that the $5.00 rate was an unacceptable cut in pay and was retaliatory in nature.

14. Throughout this time plaintiff turned down only one offer and that was with Dana Corporation and involved "team" driving. Team driving involves two drivers and requires that one drive and the other sleep for three consecutive eight hour periods. Plaintiff testified that he simply could not sleep when others drove and without sleep he would be unable to take the wheel when it became his turn to drive.

work as a truck driver for Faylor Milk Transport. Plaintiff was employed to transport two loads of milk per day from Fort Wayne to Muncie, Indiana. He was terminated from that employment on August 22, 1980. According to Susan Faylor, wife of the owner of Faylor Milk Transport, and the person in charge of "hiring and firing", several factors entered into the decision to terminate plaintiff's employment. Chief among the reasons given was plaintiff's excessive speed in driving and his mishandling of the tractor trailer. It was further felt, however, that by terminating plaintiff, Mrs. Faylor would not receive any more calls from McIntosh Energy Company regarding that employee.[15] While Mrs. Faylor's testimony on this score cut both ways on the issue considering her testimony as a whole and her demeanor, the court finds that the phone calls from McIntosh were a factor in plaintiff's termination from Faylor's Transport.

19. Shortly after his termination with Faylor Milk Transport, plaintiff returned to McIntosh Energy Company in an effort to secure a letter of recommendation. The avowed purpose of the request was so that plaintiff could seek employment with a west coast trucking firm. While "hints" were made about the possibility of plaintiff returning to McIntosh Energy Company should things not work out on the west coast, no affirmative offer of reemployment was made by defendant Russell McIntosh.

20. In mid-November 1980, plaintiff again secured full time employment with Transport Careers in Garrett, Indiana. Transport Careers is a trade school for semi driving and plaintiff is employed as an instructor. Only occasionally does plaintiff do any driving for that company.[16]

21. Plaintiff was first employed by Transport Careers for $4.50 per hour. In December of 1980 his salary went to $5.00 per hour and in October of 1981 his salary was raised to $6.00 per hour. At the time

of trial plaintiff was still employed by Transport Careers at that latter rate.

### Conclusions of Law

This case presents a variety of issues which must be addressed in order to resolve the controversy between the parties. In an effort to sort out and clarify those issues, the remainder of the judgment will be divided based upon the following considerations. First, because there exists a dispute about the ability of plaintiff to bring this suit, consideration must be given as to plaintiff's "standing." If standing is found to exist, the second question becomes one of whether or not liability has been established with respect to the named defendants. If liability is established, the third and final question becomes the amount of damages, if any, to which plaintiff is entitled.

As can be seen, the foregoing issues necessarily evolve from one another. Because the question relating to damages need only be answered if liability is established and because the issue relating to liability need only be addressed if standing is found to exist, it is to the issue of standing which the court first turns.

### Standing

The essence of plaintiff's claim rests upon his contention that his firing from McIntosh Energy Company had as its genesis the Wage and Hour investigation. That investigation culminated in an award of back pay and it was that award, in plaintiff's view, which ultimately led to his retaliatory discharge. Defendants, while denying that the discharge occurred for other than legitimate reasons, argue that plaintiff has no standing to bring this action inasmuch as plaintiff does not fall within the protection of the relevant statute—29 U.S.C. § 215(a)(3).

So far as pertinent, 29 U.S.C. § 215(a)(3) provides:

---

**15.** Susan Faylor testified that she received at least "four to five" phone calls from Russell McIntosh.

**16.** In fact, it is very rare that any instructors drive given the limited nature of their license.

(a) ... it shall be unlawful for any person ...

\* \* \* \* \* \*

(3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding ...

29 U.S.C. § 215(a)(3). Assuming for the moment that plaintiff was in fact discriminated against, the question with regard to standing becomes one of whether or not plaintiff falls within the protection of the above quoted statute. It is clear that plaintiff did not file a complaint with the Wage and Hour Division of the Department of Labor nor did plaintiff initially institute the proceeding which ultimately led to his receipt of a back pay award. What is not so clear, however, is whether or not plaintiff falls within the ambit of the statute either because he "instituted any proceeding" or because he has "testified ... in any such proceeding."

Though a strict reading of 29 U.S.C. § 215(a)(3) suggests that plaintiff does not fall within the class protected by that statute, the court is nevertheless of the view that plaintiff should receive the benefits of the Act. This conclusion rests upon this court's review of the case law (such as it is) and the Congressional purpose behind the enactment of the statute.

The issue of standing under 215(a)(3) has been the subject of few reported decisions. Presumably this is a result of the fact that prior to the 1977 amendment to section 216(b), a serious question existed as to whether or not a private right of action existed under section 215(a)(3) of the Wage and Hour laws. *See e.g. Reeves v. International Telephone & Telegraph Corp.*, 616 F.2d 1342 (5th Cir.1980); *Bush v. State Industries, Inc.*, 599 F.2d 780 (6th Cir. 1979). Because it was unclear as to whether a private right of action existed, the vast majority of cases of this nature were brought by the Secretary of Labor and it would be rare indeed for that office to

initiate litigation on behalf of one who had not actually filed a complaint with the Wage and Hour Division.

In advancing the argument that standing exists in this case, plaintiff principally relies upon the decisions in *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179 (8th Cir. 1975) and *Wirtz v. Ross Packaging Co.*, 367 F.2d 549 (5th Cir.1966), which presented factual situations analagous to those of the case at bar. While both cases at least facially support plaintiff's position they are not dispositive.

In *Brennan*, the Department of Labor conducted an investigation which revealed that nine employees of defendant Maxey's Yamaha were due overtime wages. Upon the government's urging, Maxey made out back pay checks to those employees and proceeded to request at least five of the employees to endorse the checks and return them to the company as a "loan." One employee refused to do so and proceeded to quarrel with the owner who, in turn, fired her. The United States Court of Appeals for the Eighth Circuit found the discharge to be a violation of 29 U.S.C. § 215(a)(3).

Similarly, in *Ross Packaging*, after a Wage and Hour investigation of defendant's business revealed violations of Title 29, the defendant corporation agreed to make restitution of the wages unlawfully withheld. Receipt forms were prepared to evidence payment of the deficiencies which many of the employees signed even though they had not in fact been paid. Three who refused to participate in the scheme were promptly discharged. The Fifth Circuit Court of Appeals sustained the district court's conclusion that a violation of section 215(a)(3) had been made out.

As can be seen, the facts underlying the decisions in *Brennan* and *Ross Packaging* are somewhat analagous to those involved in this case. But it cannot be said that those cases are decisive on the question of standing. This is so because standing vis-a-vis what constitutes the "initiation of a proceeding" or "testifying in a proceeding"

was not addressed by either court. Nor does either case make clear the extent of involvement of the aggrieved parties [17] in the Department of Labor investigation. It could be supposed that in both cases the aggrieved parties were only tangentially involved in the investigation for in *Brennan* the court intimated that the employee's "discharge was a direct result of her insistence upon receiving retroactive benefits [back pay] required under the Act." [18] *Id.* at 181, and the court in *Ross Packaging* indicated that the discharge resulted immediately after the employees "insisted upon payment of their back wages before signing their receipt forms ...". *Id.* at 550. But that is supposition which the court need not make for other decisions point to the conclusion that standing should exist in this case.

It has been stated that "where the immediate motivating factor for an employee's discharge is the employee's assertion of statutory rights under the Act *either officially or in complaints at work,* the discharge is discriminatory ...", *Bonham v. Copper Cellar Corp.,* 476 F.Supp. 98, 103 (E.D.Tenn.1979) (emphasis added), within the meaning of section 215(a)(3). It has further been stated that where an "employee had given a statement to the Department of Labor investigation during the course of his investigation of defendant's business", a positive and overt action had been taken and that employee was to be "protected by Section 15(a)(3) of the act." *Wirtz v. C.H. Valentine Lumber Co.,* 236 F.Supp. 616, 618 (E.D.S.C.1964), *citing Mitchell v. Equitable Beneficial Life Health and Accident Co.,* 34 CCH Lab. Cas. 71, 428 (D.N.J.1958).

In the present matter, as the findings of fact make clear, plaintiff made several efforts to secure his just desserts. First, plaintiff spoke with an investigator from the Department of Labor and signed a statement relating to his entitlement to overtime. Second, plaintiff objected to, and balked at, the suggestion that the check should either be returned as a gift or given to charity. Third, and prior to his discharge, plaintiff informed Mr. McIntosh of his belief that a reduction in his wages to the minimum pay rate was illegal and further informed Mr. McIntosh that he would contact the Wage and Hour Division about the circumstances. These activities in the court's view constitute sufficient "positive and overt" acts within the meaning, and protection, of section 215(a)(3) so as to permit plaintiff to bring this suit.

The purpose behind the enactment of the Wage and Hour provision lends further support to the conclusion that present plaintiff had standing to bring this action. The intent of Congress in enacting section 215(a)(3) was summarized by the United States Supreme Court in *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 80 S.Ct. 232, 4 L.Ed.2d 323 (1960), as follows:

> The central aim of the Act was to achieve, in those industries within its scope, certain minimum labor standards.... Congress did not seek to secure compliance with prescribed standards through continuing detailed federal supervision or inspection of payrolls. Rather, it chose to rely on information and complaints received from employees seeking to vindicate rights claimed to have been denied. Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances.... By the proscription of retaliatory acts set forth in § 15(a)(3) [29 U.S.C. § 215(a)(3)] ... Congress sought to foster a climate in which compliance with the substantive provisions of the Act would be enhanced.

*Id.* at 292, 80 S.Ct. at 335 (citations omitted). The 1977 Amendment to section 216(b) which codified a private right of action further solidifies the notion that

---

17. The nominal plaintiff was the Secretary of the Department of Labor who filed suit on behalf of the employees.

18. It should also be noted that in that case plaintiff was not even aware that she was entitled to back pay until the due date which suggests that her involvement in the investigation was very limited.

Congress intended the statute to have a far reaching effect. Far enough, in fact, that at least one court has held that the proscription of 215(a)(3) against retaliatory discharge extends to the *spouse* of a complainant. *Marshall v. Georgia Southwestern College*, 489 F.Supp. 1322 (M.D.Ga. 1980).

So if 29 U.S.C. § 215(a)(3) is intended to protect one who complains officially or at work, *Bonham, supra;* if it protects an employee who has given a statement, *C.H. Valentine, supra;* and if it protects the spouse of a complainant, *Georgia Southwestern College, supra,* then it must protect present plaintiff. "Otherwise the purposes of the statute could be subverted through indirect retaliations with impunity." *Georgia Southwestern College, supra* at 1331.

Were standing not found to exist in this case, all beneficiaries of a Department of Labor investigation would be stripped of the protection afforded under the Act unless each and every one of them instituted the investigation or the Secretary decided to pursue a complaint. Certainly Congress had more than that in mind in enacting 29 U.S.C. § 215(a)(3). Accordingly, the court is of the view that plaintiff has standing to bring this suit.

*Liability*

Since this court is of the view that standing exists in this case, the next issue to be determined is whether or not liability has been established. The court is of the view that defendants Russell McIntosh and McIntosh Energy Company are liable to plaintiff.[19]

■■■ "The purposes of the Fair Labor Standards Act require that employees throughout the country feel confident that they may bring a complaint to the Department of Labor without being penalized by their employers." *Goldberg v. Bama Manufacturing Corp.*, 302 F.2d 152, 156 (5th Cir.1962). "Section 15(a)(3) violations involve discriminatory treatment of an employee in retaliation for said employee's exercise of his or her rights." *Brennan v. Braswell Motor Freight Lines, Inc.*, 396 F.Supp. 704, 707 (N.D.Tx.1975). Prohibited retaliation under the Act may take the form of either discrimination at the job site or discharge from employment. 29 U.S.C. § 215(a)(3). "Where the immediate cause of either discrimination treatment or the discharge of an employee was the assertion of a statutory right under the Fair Labor Standards Act, such treatment or discharge is prohibited by section 15(a)(3)." *Braswell Motor Freight, supra* at 707, *citing Bama Manufacturing, supra.*

■■■ The facts underlying the present case suggest that plaintiff was discharged in retaliation for his refusal to make concessions with respect to the back pay check. The timing of the underlying events leads unerringly to that conclusion.

Prior to the actual receipt of the back pay award it was suggested to plaintiff that he either return the check as a gift or he donate the award to charity. Substantial evidence supports the conclusion that that suggestion was made.[20] Immediately after the receipt of the back pay check, and after plaintiff made it clear in no uncertain terms that he was going to keep that which was rightfully his, defendant Russell McIntosh cut his pay to minimum wage. While defendants suggest that the reduction was legitimate insofar as it complied with the minimum wage laws, the court is of the view that the reduction evidenced a concerted effort to retaliate against plaintiff for taking the check, first, because there

---

**19.** This court is of the view that the evidence does not support finding defendant Joan McIntosh personally liable. While McIntosh Energy trucks might be jointly registered in her and her husband's names, and while the property may be leased in both of their names, nothing in the record suggests that she was involved in any of the transgressions involved in this case. Indeed it is clear that she was not employed by McIntosh Energy, let alone plaintiff's boss. Thus the court grants defendant Joan McIntosh's "Motion for Directed Verdict" made during the trial of this cause. *See e.g. Hodgson v. Winn's Stores, Inc.*, 78 L.C. 47352 (S.D.Tx.1972). See notes 2 *supra* and note 22 *infra.*

**20.** *See* notes 8 and 9, *supra.*

would be no reason to detract from that stance were it legitimate,[21] and second, because the reduction came immediately upon the heels of plaintiff's decision to keep the check. Also of concern is the fact that at the time the dispute over the check arose, Russell McIntosh hired another driver to do the same job plaintiff had been doing undisputably well up until that time. Further, after plaintiff took his vacation, he was offered continued employment at a reduced wage of $5.00 per hour. Little wonder plaintiff did not desire to continue the employment with McIntosh Energy Company.

As was touched upon in the section relating to standing, the facts underlying the discharge in this case are analogous to those presented to the courts in *Maxey's Yamaha* and *Ross Packaging*. In both cases, the courts found the discharges to be retaliatory, where, as here, the discharge followed quickly upon the heels of a dispute over a back pay award. As in *Ross Packaging* and *Maxey's Yamaha*, plaintiff's discharge was a direct result of his insistence upon receiving retroactive benefits required under the Act. It matters not whether a scheme is found to exist so long as plaintiff's protest resulted from a reasonable belief that defendants' conduct was unlawful. *Maxey's Yamaha, supra* at 181.

In the present matter, the court is of the view that the facts establish that plaintiff's discharge resulted from his legitimate insistence upon retaining the back pay award. Plaintiff reasonably believed that defendants' conduct was unlawful and plaintiff persisted in demanding that to which the Department of Labor had found

to be due and owing plaintiff. Such insistence is protected from reprisals. This is true regardless of the existence of other grounds for discharge, *Bama Manufacturing, supra* at 154, though the present record does not support a finding that plaintiff was less than an exemplary employee.

■ "Furthermore, a former employee is clearly protected against any type of harassment after employment has ended." *Bonham, supra* at 103. "Under the law, employers cannot be permitted to punish former employees by seeking to have them 'black-listed' by potential employers." *Id. citing Dunlop v. Carriage Carpet Co.,* 548 F.2d 139, 147 (6th Cir.1977). Here, defendant Russell McIntosh, upon learning that plaintiff was employed by Faylor Transport, contacted Susan Faylor of that firm on four to five occasions suggesting that she might be sued by plaintiff if Faylor Transport paid plaintiff on a "per trip" basis. While these communications were somewhat ignored by Mrs. Faylor, it was thought that among the benefits of terminating plaintiff's employment with Faylor Transports was the fact that these communications from Russell McIntosh would cease. More importantly, in the court's view these communications further evinced defendant Russell McIntosh's intent to retaliate against plaintiff in violation of 29 U.S.C. § 215(a)(3).

Taken in balance, the court is of the view that defendants Russell McIntosh and McIntosh Energy Company terminated plaintiff in retaliation for protected activity.[22] As such, those defendants violated

---

**21.** That is, why raise it back to $5.00 per hour?

**22.** There can be no doubt but that both defendant Russell McIntosh and McIntosh Energy Company are liable for plaintiff's injuries. Under the Fair Labor Standards Act, an "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). "Whether a person is an employer is essentially a question of fact," *Donovan v. Sabine Irrigation Co., Inc.,* 531 F.Supp. 923, 929 (W.D.La.1981), and, "each case must be considered in light of the total situation or situations or whole activity to determine whether an employer-employee situation

exists." *Wirtz v. Soft Drinks of Shreveport, Inc.,* 336 F.Supp. 950, 957 (W.D.La.1971). "[O]fficers of corporations are routinely held to be 'employers within the meaning of the FLSA ...'", *Marchak v. Observer Publications, Inc.,* 493 F.Supp. 278, 282 (D.R.I.1980), as is the corporation itself. *Marshall v. Sam Dell's Dodge, Inc.,* 451 F.Supp. 294 (N.D.N.Y.1978). Given the facts of this case, it is clear to the court that both defendant Russell McIntosh and defendant McIntosh Energy Company are liable to plaintiff. *See also Shultz v. Clay Transfer Co.,* 50 F.R.D. 480, 481 (E.D.N.C.1970). See notes 2 and 19 *infra*.

section 215(a)(3) and are liable to plaintiff for the wrongful termination.

*Damages*

Having determined that plaintiff has standing to bring this suit and having determined liability in favor of plaintiff the last question becomes what remedy should be given plaintiff for defendants' wrongdoing.

■ "Any employer who violates the provisions of section 215(a)(3) of this title shall be liable for such legal or equitable relief *as may be appropriate to effectuate the purposes of section 215(a)(3)* of this title, including without limitation employment reinstatement, promotion, and payment of wages lost and an additional amount as liquidated damages." 29 U.S.C. § 216(b) (emphasis supplied). "Generally, in order to carry out the purposes of Section 215(a)(3) by freeing employees of the fear of economic retaliation, the discharged employee should be restored, as nearly as possible, to the same situation he would have occupied if he had not been discharged." *Bama Manufacturing, supra* at 156. In most (but not all) cases "this requires both reinstatement and reimbursement." *Id.; generally Mitchell v. Robert De Mario Jewelry,* 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960).

■ In the present matter the court is of the view that while reimbursement is in order, reinstatement is not. The principal reason for this conclusion stems from the fact that the business of the employer is a small one. The evidence adduced at trial made clear that plaintiff and defendant Russell McIntosh worked in close proximity to each other on a daily basis. Even without regard to who is wrong in fact, it is clear that any sort of viable working relationship between the parties is presently impossible. Whatever bitterness might have existed between the parties prior to this lawsuit could only have been exacerbated during the pendency of the litigation. To place the parties once again in a working environment in the court's view would not be in the best interests of either party. *See e.g. Marshall v. Mardels, Inc.,* 84 L.C.

48,411 (E.D.N.Y.1978); *Hodgson v. Winn's Stores, Inc.,* 78 L.C. 47,353 (S.D.Tex.1972).

While the court is of the view that reinstatement would be inappropriate, the court is also of the view that reimbursement is necessary to effectuate the purposes of the Act. With respect to lost wages, plaintiff claims lost wage damages in the sum of $15,074.43. Plaintiff further urges that that sum be doubled by allowing liquidated damages and further requests attorney fees and costs. For their part, defendants urge that damages should be nominal and that liquidated damages should not be awarded.

Leaving aside for the moment the questions of liquidated damages, attorney fees and costs, the wages or compensation owed the plaintiff must first be determined. Plaintiff argues that he should receive as back pay the difference between what he made from the time he left McIntosh until the time of trial and what he would have made during the same period had he been employed by McIntosh Energy. Defendants, on the other hand, suggest that damages should be limited given the fact that plaintiff did receive employment within a short time after leaving the employ of McIntosh Energy.

This court does not totally agree with either parties' position. Plaintiff's claim that damages continue of necessity until the time of trial is troublesome because of the potential for misuse by discharged employees. Such employees would have no incentive to conduct themselves in such a way as to retain any position they might secure. Instead, the employee would be free to look, perhaps indefinitely, to his prior employer to pay for any gaps in employment and, in effect, the employer would become an insurer of the employee's salary.

Nor does this court believe that, in this case, liability for damages terminated immediately upon plaintiff's employment with Faylor Transport. True, some courts have held that full time permanent employment discharges a former employer's liability for

wrongful discharge, *e.g. Marshall v. Great Lake Recreation Co.*, 25 Wage & Hours Cas. (BNA) 506 (E.D.Mich.1981), and that result seems warranted where the new employment is at a wage rate equal to or higher than that of the former employment. Here, the record makes clear that plaintiff's employment at Faylor was for a lesser amount of pay. And, the fact that defendant Russell McIntosh, through his phone calls to Susan Faylor, continued his campaign of harassment and may have helped in the decision which led to plaintiff's termination from employment at Faylor, only bolsters this court's conclusion that defendants' liability for back pay did not terminate with plaintiff's commencement of employment at Faylor.

Instead, the court opts for a middle ground. Liability for back pay will extend from the time that plaintiff was terminated until the end of calendar year 1980 as the court feels that within this time period (approximately six months), if he had been more diligent, he could have found a more remunerative position even though the market was undeniably tight. Limiting damages in this way, though somewhat arbitrary, is not without precedent. *See Winn's Stores, supra* at 47,353–54 (three months limit); *Mardels, supra* at 48,417 (suggestion that damage evidence could be limited). Moreover, it appears to be in keeping with the underlying tenents of the Wage and Hour Act.

On the basis of the foregoing, the court is of the view that the defendants are liable to plaintiff in the sum of $6,057.88. That sum represents the amount plaintiff would have received from McIntosh Energy for the remainder of calendar year 1980 ($8,823.75) less the amount he did in fact earn from Faylor Transport ($1,300.00) and Transport Careers ($1,465.87) during that same period. *See Bullock v. Pizza Hut, Inc.*, 429 F.Supp. 424 (M.D.La.1977).

Having determined the amount of back pay to which plaintiff is entitled, there remains the question of liquidated damages and attorney fees.

■ An award of liquidated damages under the Wage and Hour Law is governed by 29 U.S.C. § 260, which provides:

[I]n any action commenced prior to or on or after the date of the enactment of this Act [May 14, 1947] to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.S. §§ 201–216, 217–219, 557], if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended [29 U.S.C.S. §§ 201–216, 217–219, 557], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 16 of such Act [29 U.S.C.S. § 216].

As the foregoing passage suggests, if the court finds that the defendants' actions were not done in good faith, or that the employer did not have reasonable grounds to believe that the action taken was not violative of the Wage and Hour laws, the award of liquidated damages is mandatory. Should the court find that the defendants did act in good faith and had reasonable grounds to believe that they were not violating the Wage and Hour laws, the court still has the discretion to award liquidated damages. *See Melanson v. Rantoul*, 536 F.Supp. 271, 292 (D.R.I.1982); *also Hodgson v. Miller Brewing Co.*, 457 F.2d 221, 227 (7th Cir.1972).

■ In the present matter, the court has determined not to award liquidated damages. This is so because of the fact that the court believes defendant Russell McIntosh acted in good faith (albeit mistaken) belief that his actions were lawful and that that belief was reasonable. True, the drastic reduction to minimum wage suggested bad faith, but that was only a temporary threat to plaintiff. Instead, defendant desired to keep plaintiff at the reduced rate of $5.00 per hour with the belief that in that way plaintiff could still work as long

and still receive the same rate of pay. This "Chinese overtime" as it was labeled at trial would afford plaintiff the opportunity to still take home the same rate of pay and the $5.00 wage rate was certainly above and beyond the $3.10 amount required by law.[23] Thus, the conclusion that defendants' efforts to reduce plaintiff's wage were undertaken in good faith and were reasonable.

Though the court is of the view that liquidated damages are not in order in this case, plaintiff's request for reasonable attorney fees under 29 U.S.C. § 216(b) must be treated differently. This is because "[t]he section respecting attorney fees to the employee's attorney (under the Fair Labor Standards Act) has been hailed to be mandatory and unconditional." *Pizza Hut, supra* at 432, *citing Wright v. Carrigg,* 275 F.2d 448 (4th Cir.1960). In fact, 29 U.S.C. § 216(b) mandates that "[t]he court ... shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29 U.S.C. § 216(b). "The amount of attorney fees is within the sound discretion of the trial court ...". *Miller Brewing, supra* at 228; *Pizza Hut, supra* at 432.

In the present matter, plaintiff claims attorney fees in an amount of approximately $8,500.00. That calculation is based upon multiplying the amount of hours spent by both of plaintiff's counsel in this case by an hourly rate of $75.00 per hour. While this court views the hourly rate as reasonable, some concession must be made for the overlap that occurred by having two attorneys represent plaintiff. To compensate for the overlap, the court is of the view that the time spent should be reduced by fifteen percent (15%). Considering this to be a reasonable adjustment, the court calculates the reasonable attorney fees to be $7,426.50.[24]

Given the rather simple background of this case, the fact that the issues were not entirely novel and the fact that only one plaintiff was involved, the court finds $7,426.50 to be reasonable attorney fees in this action. Accordingly, defendant is liable for attorney fees in that amount.

### Conclusion

On the basis of the foregoing, it is ORDERED, ADJUDGED and DECREED as follows:

(a) Plaintiff has standing to bring this suit;

(b) Defendants Russell McIntosh and McIntosh Energy Company are liable to plaintiff for back pay in the amount of $6,057.88;

(c) Defendants are further liable for plaintiff's attorney fees in the sum of $7,426.50; and

(d) Costs to plaintiff.

---

**23.** There was some suggestion that the idea of "Chinese Overtime" came from Mr. Hoffman of the Wage and Hour Division. It is important to note that while Mr. Hoffman did not recall such a suggestion, he did not deny that in many cases such a suggestion might be made.

**24.** Plaintiff had two attorneys in this litigation. Attorney Burke spent 68.5 hours on this case while Attorney Webster spent 48 hours on this case. Adding those figures, 116.5 hours were spent by plaintiff's counsel in this case. Reducing the time spent by fifteen percent (17.48 hrs.) the allowable time equals 99.02 hours. Multiplying those hours by Seventy Five Dollars per hour (99.02 × $75.00) the court finds $7,426.50 to be the reasonable attorney fees in this cause.