Lynn MARTIN, Secretary, United States Department of Labor, Plaintiff,

v.

HAWKEYE INTERNATIONAL TRUCKS, INC., d/b/a Hawkeye Truck Leasing, Inc., Defendant.

No. 3–90–CV–20108.

United States District Court, S.D. Iowa, Davenport Division.

Aug. 12, 1991.

Mary D. Wright, U.S. Dept. of Labor, Kansas City, Mo., for plaintiff.

Constance Schriver, Davenport, Iowa, for defendant.

OPINION

CELESTE F. BREMER, United States Magistrate Judge.

This is an action brought by the Secretary of the United States Department of Labor pursuant to 15 U.S.C. § 1671 *et seq.*, alleging that the defendant violated the Consumer Protection Act by discharging

an employee for having his earnings subjected to a garnishment. Defendant denies this allegation. The parties consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and this case was referred to the undersigned on February 19, 1991. A court trial was held July 16, 1991; posttrial briefs and arguments were filed by August 2, 1991. This matter is fully submitted.

Plaintiff requests an injunction restoring the employee's past and future wages together with prejudgment and postjudgment interest.

## FINDINGS OF FACT

George K. Anderson was hired as manager of Hawkeye Truck Leasing, Inc., a division of Hawkeye International Trucks, Inc., on September 1, 1989. He was terminated April 20, 1990. His annual salary was $65,000. He had medical benefits, a company car, and contributed to a 401K Savings Plan with matching funds by the employer. He had no employment contract, and was an "at will" employee.

Hawkeye Truck Leasing, Inc. (HTL) is a subsidiary of Hawkeye International Trucks, Inc. (Hawkeye). The primary purpose of HTL is to secure long and short term leases for the company's trucks and trailers. Since the company's inception HTL had not performed as anticipated. Anderson was hired primarily to turn the truck leasing business around and make HTL profitable, which was estimated could take up to two years. The leasing business for HTL did not improve materially in the eight months Anderson was employed, nor did it improve significantly after he was terminated. Anderson reported to Edmund F. Conroy, who is the president of HTL, Hawkeye and another related company, Riverside International Trucks, Inc.

In the fall of 1989 and the early part of 1990 James Goodlander, the comptroller of Hawkeye, had discussions with Anderson relating to HTL's nonpayment of suppliers and nonpayment of state fuel tax permits. Goodlander instructed Anderson to continue the use of intercompany loans from Hawkeye to provide sufficient funds for HTL's payment of these invoices. Anderson was cautioned to keep all payments current, even though continued dependence on intercompany loans decreased the profitability of HTL. Anderson was concerned that the lack of profitability of HTL would affect his performance evaluations and future bonus payments. Only after Anderson was terminated did Goodlander and Conroy discover that the nonpayment of suppliers and state fuel tax permits continued through April 1990, potentially jeopardizing the company's credit rating as well as its authorization to travel in certain states. After Anderson's termination Conroy discovered that Anderson had similar performance problems when acting as a leasing manager for a previous employer in Illinois.

On April 6, 1990, Conroy held a performance evaluation with Anderson and, as reflected in a memo to Anderson's file, outlined three specific areas in which Anderson could improve his performance. The prior discussions between Goodlander and Anderson about payments, intercompany loans, and profitability were not mentioned during the evaluation. Conroy admitted that he had no intention of terminating Anderson after the April 6, 1990 evaluation, and in fact hoped Anderson would be successful in improving the leasing business, even though no new long term lease accounts had been obtained in his first eight months on the job. Any bonus payment to Anderson would have been calculated and awarded after he had been with HTL for one year. All bonuses were paid in the fall of each year. No bonus was paid to Anderson in 1989, and the court finds that no bonus would have been paid to him in 1990, due to poor work performance.

On April 18, 1990, defendant received a levy on Anderson's wages from the Internal Revenue Service (IRS) in the amount of $54,590.22. This was the first and only garnishment of his wages received during Anderson's employment at HTL. Anderson had owned a business which went through bankruptcy and over the previous four years had been embroiled in a

dispute with the IRS over the amount of withholding taxes, penalties, and interest still due as a result of that business. Conroy was aware of the IRS dispute and Anderson's business history at the time he hired him, and had personally guaranteed a bridge loan so that Anderson was able to purchase a house in Iowa. The bridge loan was required because Anderson was unable to sell his house in Illinois, upon which the IRS had a lien. When hired, Anderson had assured Conroy that he was continuing to attempt to resolve this issue with the IRS.

On April 19, 1990, Anderson and Conroy heatedly discussed the IRS levy, Anderson's job performance, and the invoice/intercompany loan payments. They also addressed the situation regarding Miller Container trailers.

Miller Container was HTL's only major client, and the owners of Miller Container were Conroy's personal friends. As leasing manager Anderson was directly responsible to ensure proper service and maintenance was provided for the Miller account. In early 1990 two Miller Container trailers had been painted by a Chicago company instead of one of the companies related to Hawkeye. At the time the trailers were painted Conroy was aware of Anderson's decision to send them outside of the Hawkeye/Riverside companies. It is unclear if Conroy was aware that no intercompany bid had been received, or if Anderson realized one might be required.

Anderson had been sued by the Chicago company in conjunction with his former business and the use of this company gave the appearance of an attempt by Anderson to resolve this pending litigation with the use of HTL's business. Conroy did not learn of the litigation until after the trailers were returned from Chicago when he and another manager were discussing the poor quality of the painting.

Subsequently, all of the remaining Miller units were painted on an intercompany basis for the same or better cost. Conroy was also concerned that continued use of the Chicago company might result in HTL's involvement with Anderson's ongoing litigation or expose the Miller trailers to delays in their return from Chicago. He felt that Anderson used poor business judgment in selecting this company.

In addition to the problems with the painting, it was discovered after Anderson was terminated that many Miller Container units had not been serviced as required under the leasing agreement.

After reviewing job performance and the levy on April 19, Anderson and Conroy reconvened on April 20, for further discussions. Conroy felt he was not receiving satisfactory answers from Anderson on the topics discussed, and terminated him.

Between April 6 and April 20, 1990, some additional information about the areas of concern covered in the April 6 evaluation may have come to light, but no new material facts about Anderson's performance were discovered by Conroy. Conroy maintains that the levy was not a factor in his decision to terminate Anderson. The court finds that it was.

After his termination, Anderson accepted a job as a fleet account manager and began work May 15, 1990, with White GMC of Chicago where he is presently employed. His salary is $2,000 a month plus a commission based upon truck sales. For the balance of 1990 at White GMC he earned $21,686.62 and from January 1 through July 15, 1991 he earned $30,123.03. As of May 15, 1991, he has been eligible to participate in a 401K Plan.

## CONCLUSIONS OF LAW

### A. *Statutory Protection*

The Congressional intent of 15 U.S.C. § 1674(a) was to secure the employee's job in the event that the employee's wages were garnished due to indebtedness. *Donovan v. Southern California Gas Company*, 715 F.2d 1405, 1408 (9th Cir.1983). Initially it was proposed that garnishment actions be prohibited altogether. *Id.* at 1407. Instead, 15 U.S.C. § 1673 limits the amount a creditor may receive by garnishment during a specific pay period, and § 1674(a) prohibits the employer from discharging the employee in the event of a single garnishment. *Id.* By so doing, Congress pro-

vided protection of the employee's income, while allowing creditors to collect outstanding judgments.

Currently the statute provides "[n]o employer may discharge any employee by reason of the fact that his earnings have been subjected to garnishment for any one indebtedness." 15 U.S.C. § 1674(a). The statute is designed to be remedial and as such should be liberally interpreted, affording employees the utmost protection. *Ellis v. Glover & Gardner Construction Co.*, 562 F.Supp. 1054, 1065 (M.D.Tenn.1983). The IRS levy in this case was a garnishment within the meaning of the Act. *See* 15 U.S.C. § 1672(c).

Though 15 U.S.C. § 1674(a) is designed to protect the rights of private individuals, there is no private cause of action under this subchapter. *McCabe v. City of Eureka*, 664 F.2d 680 (8th Cir.1981). Accordingly, this action was properly brought on behalf of Anderson by the Secretary of Labor, and the court has jurisdiction over the parties. 15 U.S.C. § 1746; 28 U.S.C. § 1345.

The protection from discharge after a garnishment is very similar to the antidiscrimination statute of the Fair Labor Standards Act, 29 U.S.C. § 660(c). Under that statute, if the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights, the discharge is discriminatory regardless of whether other grounds for discharge exist. *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179 (8th Cir.1975); *See also Mitchell v. Goodyear Tire & Rubber Co.*, 278 F.2d 562 (8th Cir.1960) (discharge considered discriminatory when assertion of the statutory right was "the straw that broke the camel's back.").

Defendant claims that Anderson was terminated because of poor performance and his failure to give satisfactory answers when questioned about these issues on April 20, 1990. However, all of Anderson's performance problems existed prior to the April 6 evaluation, and no disciplinary action was taken against him nor was termination considered. There is no showing that Anderson's performance between the date of his last evaluation and termination declined significantly. The only element added to the situation was defendant's receipt of the IRS levy notice on April 18. Anderson was then terminated April 20. Evidence discovered after April 20 of Anderson's ongoing poor performance cannot serve as a justification for the April 20 termination. Thus, the court finds that the notice of garnishment was a motivating factor in Anderson's termination, and that plaintiff is entitled to relief.

### B. *Measure of Damages*

The Consumer Protection Act does not have an express provision for the award of damages. In *Ellis v. Glover & Gardner Construction Company*, 562 F.Supp. 1054 (M.D.Tenn.1983), the district court found that compensation for Title VII employment discrimination was an appropriate analogy and ruled that the wrongfully discharged employee was entitled to reinstatement as well as back pay. *Id.* at 1066. This court finds that reasoning to be sound and applies it to this case.

Even though this court finds that a motivation for Anderson's discharge on April 20, 1990 was the garnishment, it does not ignore the fact that his work performance was marginal. Anderson did not perform satisfactorily in increasing the leasing business or in his administrative duties. Based on the evidence presented, the court finds that Anderson would have been discharged no later than the time of his next scheduled performance evaluation, September 1, 1990 and that reinstatement is not an appropriate remedy.

Therefore, the court finds that the measure of damages is Anderson's lost wages through September 1, 1990, or $13,235.28,[1]

1. The lost wage and benefit calculation is based upon:

| | |
|---|---|
| HTL salary from 4/20/90–9/1/90: | $23,750.00 |
| Less White GMC wages from 5/15/90–9/1/90* | − 10,514.72 |
| | $13,235.28 |
| Plus 401K contribution (19 weeks at $12) | + 228.00 |
| | $13,463.28 |

* This amount is based on Anderson's average weekly wage at White in 1990; $21,686.62 divided by 33 weeks equals $657.17 times 16 weeks from 5/15–9/1.

plus the $228.00 employers' contribution to his 401K plan, for a total of $13,463.28. Plaintiff is not entitled to any front pay. The court also awards prejudgment interest on this amount, using the Internal Revenue Code's sliding scale of interest rates contained in 26 U.S.C. § 6621(c). *See Equal Employment Opportunity Commission v. O'Grady*, 857 F.2d 383, 392 (7th Cir.1988). The parties shall confer on the calculation of interest and submit a stipulation or proposals as to the amount of prejudgment interest to the court by August 23, 1991. Once a determination is made on the amount of interest the court will enter a judgment.

Costs of this action shall be paid by Defendant.

IT IS SO ORDERED.