**George P. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,**

v.

**LOUISIANA TRAILER SALES, INC., Defendant-Appellee.**

**No. 27956.**

United States Court of Appeals, Fifth Circuit.

June 22, 1970.

Rehearing Denied July 16, 1970.

**62**

Harold C. Nystrom, Acting Solicitor of Labor, U. S. Dept. of Labor, Washington, D. C., Beverley R. Worrell, U. S. Dept. of Labor, Office of the Solicitor, Birmingham, Ala. Bessie Margolin, Carin Ann Clauss, Washington, D. C., for appellant.

Louis A. DiRosa, New Orleans, La., for appellee.

David J. Humphreys, Washington, D. C., amicus curiae for Mobile Housing Assoc. of America.

Before JOHN R. BROWN, Chief Judge, AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

The sole question for determination in this matter involving a statutory interpretation is whether the overtime exemption provisions of Section 13(b)(10) of the Fair Labor Standards Act, 29 U.S.C. § 213(b) (10) (1966), are applicable to five employees of appellee Louisiana Trailer Sales, Inc., known as "servicemen" and "service-mechanics." The District Court found the employees

to be within the overtime exemption provisions of the Act. We disagree for reasons which follow.

Section 13(b) (10) of the Act exempts from overtime coverage

> "any salesman, partsman, or mechanic primarily engaged in selling or servicing automobiles, trailers, trucks, farm implements, or aircraft if employed by a nonmanufacturing establishment primarily engaged in the business of selling such vehicles to ultimate purchasers."

The pertinent facts have been stipulated. Appellee, a nonmanufacturing concern, is engaged in the sale of new and used house trailers or mobile homes. The parties further stipulated that the word "trailer" as used in the Act includes mobile homes. The hybrid nature of a mobile home, however—as a vehicle when moving from place to place, and as a residence when permanently mounted on a stationary base—has engendered much of this controversy in determining the intent of the Legislature in excluding trailers from the Act's coverage. In order to come within the exemption provisions of the Act, the servicemen must meet three essential requirements. They must be (1) *mechanics*, (2) who are *primarily* engaged in (3) servicing *trailers*. It is not disputed that the term "primarily engaged" as used in the Act contemplates in excess of fifty per cent of the employees' hours of work.[1] The duties of the servicemen in question are detailed in the stipulation to include:

"A. Checking the interior and exterior of mobile homes and trailers received from manufacturers for any defects in workmanship or damages and repairing same.

"B. Checking, servicing, repairing and replacing parts in appliances, the plumbing, electrical air conditioning, structural and butane gas systems in mobile homes and trailers both before and after delivery to customers.

"C. Connecting up the plumbing, air conditioning, electrical, sewer and gas

1. See 91 Wage and Hour Manual, pp. 931, 935–937.

systems to water, electric, gas and sewer lines at the customer's site after delivery.

"D. Delivering mobile homes and trailers from defendant's establishment to the customer's site.

"E. Constructing concrete block foundations for installation of mobile homes and trailers at customer's site.

"F. Placing and servicing mobile homes and trailers on foundations at customer's sites.

"G. Performing carpentry work inside mobile homes and trailers, e. g., freeing up or replacing wooden doors, door frames, window frames, flooring, paneling or partitions.

"H. Repairing any leaks resulting from openings in the hulls of mobile homes and trailers, or leaks in roof during warranty period, to-wit, one year after delivery.

"I. Painting the interior and exterior of mobile homes and trailers (primarily used trailers).

"J. Repairing or replacing tile in the bathrooms, kitchens or showers of mobile homes and trailers.

"K. Repairing and/or replacing exterior aluminum panels or other portions of mobile homes and trailers or appliances which may be damaged in transit or during installation at the customer's site.

"L. When circumstances required it, these employees checked, serviced or repaired the running mechanisms of the mobile homes and trailers such as wheels, axles, brakes and signal lights but these functions were occasional and did not re- quire any substantial amount of employee time."

The Secretary contends that the term "mechanic" should be restricted to employees performing those services which are ordinarily performed in the automotive industry; for example, checking wheels, axles, brakes and signal lights, and in transporting these homes for delivery.[2] The Secretary readily admits that the servicemen perform these functions but argues that the bulk of their duties consists of converting the mobile homes into permanent residences and in servicing and maintaining them thereafter and that they are not therefore "mechanics" servicing "trailers" within the intendment of the exemption.

The question admittedly is a close one because of ambiguities in the Act which are not resolved by statutory definition. The statute defines neither "mechanic" nor "trailer" and our resort to dictionaries produces only further ambiguities because of the various shades of meaning ascribed to both terms. The only light shed on the term "mechanic" is contained in the following language of House Report No. 1366, 89th Cong., 2d Sess., 1966, pp. 42–43:

"The term 'mechanic' is intended to include all employees doing mechanical work, such as get-ready mechanics, automobile, truck, farm implement, or aircraft mechanics, body or fender mechanics, used car reconditioning mechanics and wrecker mechanics."

The definition, containing as it does a variant of the term defined, is not too helpful. However, the illustrative group-

2. The following excerpt from an opinion signed by Wage and Hour Administrator Clarence T. Lundquist, January 4, 1968, 91 Wage and Hour Manual, p. 935, exemplifies the position taken by the Secretary:

"As used in section 13(b) (10) with respect to trailers the term 'mechanic' describes an employee whose primary duty (i. e., more than 50 percent of his work time) is spent performing mechanical work on trailers to place them in proper operating condition by repairing and servicing their running mechanisms, such as wheels, axles, brakes, hitches, and signal lights. Thus, those employees who are engaged in checking the plumbing, electrical and butane gas systems, the doors, windows and other structural features of the trailer to make certain that they are in working order, would not be included in the exemption. This interpretation is based on the premise that the exemption was intended to apply to mechanics but not to servicemen who perform the same type of duties as the thousands of individuals who service household appliances and make home repairs."

ing of words following the definition has a vehicular connotation and is suggestive of automotive units.[3] The definition of "mechanic" was submitted by the House prior to the addition of the term "trailer" to the exemption provisions of Section 13(b) of the Act. The reasonable conclusion is that at that time at least there was no consideration of the applicability of the term "mechanic" to the mobile home industry, whose servicemen admittedly perform myriad diversified functions not usually associated with vehicles or performed by mechanics, ranging in nature from the installation of plumbing to constructing concrete block foundations for installation at building sites. Thereafter the legislative history is silent to any relating back of the term "trail-

er" to the term "mechanic." It is also noteworthy that in the Hearings before the House Labor Subcommittee during the first session of the 89th Congress, the mobile home industry's emphasis centered on obtaining the overtime exemption for its salesmen, not mechanics.[4]

As previously noted, the term "trailer" is not defined in the statute. The Act includes the term with the same series of words—automobiles, trucks and farm implements—contained in the House Report definition of "mechanic." The Act specifically refers back to the series as "such vehicles." [5] The only sense in which the word "vehicle" could reasonably have been intended is that connoting a moving conveyance or means of transportation.[6]

3. The retention by the Committee of the term "farm implements" in the overtime exemption, although not compelling an inference that the implements are considered vehicular and mechanical in the sense of having moving parts, does not preclude such an inference. More significantly, however, is the relation of farm implements to employment in agriculture, a field which has historically enjoyed both the overtime and minimum wage exemptions. See 29 U.S.C. § 213 (a) (1938).

4. Hearings before the House Labor Subcommittee, H.R. 8259, 89th Cong., 1st Sess., 1965, pp. 657–660.
An amendment was proposed which would have exempted from the Act's overtime provisions "any employee employed as a salesman or serviceman by the establishment primarily engaged in selling mobile homes, travel trailers or camping trailers." The amendment was rejected, and as finally enacted the amendment contained the word "trailers" in lieu of the three suggested. It is not clear from the legislative history whether the substituted term was intended as a restriction or as an expansion to cover similar structures under one heading. However, the remarks of the committee chairman, Congressman Roosevelt, following the proposed amendment and an explanation by its advocate, suggest his rejection of exemption coverage for repairmen servicing any permanently land-based unit. Hearings before the House Labor Subcommittee on H.R. 8259, 89th Cong., 1st Sess., 1965, p. 659.

5. To the same effect see H.Conf.Rep. 2004, 89th Cong., 2d Sess., September 6, 1966,

United States Code Congressional and Administrative News, p. 3049.

6. A report made by the Federal Home Loan Bank Board, Washington, D. C., dated May 1969, entitled "A Study of The Mobile Home Industry," demonstrates the variance between the mobile home and the ordinary travel trailer:
"It is necessary to distinguish between a mobile home and a travel trailer. A mobile home has been defined as a movable or portable dwelling constructed to be towed on its own chassis, connected to utilities, and designed without a permanent foundation for year-round living. It can consist of one or more units that can be folded, collapsed or telescoped when towed and expanded later for additional cubic capacity, or of two or more units, separately towable but designed to be joined into one integral unit, capable of being again separated into the components for repeated towing. A mobile home is at least 29 feet in length and 10 feet in width. Mobile homes are towed to their sites by trucks whose movements are controlled by state highway regulations, or they are shipped on railroad flat cars. "On the other hand, a travel trailer is a portable structure built on a chassis and designed for temporary use. It is used for travel, recreation, and vacation purposes. Most manufacturers label their units 'recreational vehicle' in order to distinguish them from mobile homes. A recreational vehicle is also distinguishable by its size which may be no more than 8 feet wide and 32 feet long. These units may be towed by an automobile. * * *

A statute susceptible of more than one meaning must be read in the manner which effectuates rather than frustrates the major purpose of the legislative draftsmen. Shapiro v. United States, 335 U.S. 1, 31, 68 S.Ct. 1375, 1391, 92 L.Ed. 1787 (1948). To construe the word "mechanic" in conjunction with the word "trailer" as including the various house-repair, truck driver, and construction duties [7] performed by these servicemen, is to frustrate the legislative inten-

"The distinguishing feature between a mobile home and travel trailer seems to be that one is built for permanent occupation while the other is intended to be occupied purely on a temporary basis." (P. 4.)

The Study further depicts the mobile home as an answer to the housing shortage and the growing economic needs of our country. The introduction to the Study furnishes the keynote to its contents:

"Housing for low and moderate income families is the most urgent shelter need of the Nation today. Both our industry and the Board has a mandate to do all it can to increase the supply of housing to this important segment of our ever growing population."

The following excerpts from the Study further substantiate the role played by the mobile home and the success enjoyed by the industry in supplanting the needs furnished by the conventional house-building industry:

"'* * * In 1965 there were 965,000 single family housing starts. In contrast, preliminary figures indicate that there were 794,000 single family housing starts during 1966. This represents almost a 20% decline in conventional housing starts.

"'The mobile home. industry benefited to a certain extent from the housing shortage due to the effect of tight money on housing starts * * * *

"'In 1947, factory produced homes of all kinds accounted for 12% of the housing mix. By 1967, nearly a whopping 40% of single family homes were factory produced; mobile home factories built 20% of all these homes and your "pre-fab" competitors built the same amount.'

* * * * *

"As further evidence of prospective growth, Standard and Poor's 'The Outlook' of March 18, 1968, reported the 1967 production at 241,000 units, or 11% more than 1966. 'The Outlook' continued with the following general forecast: 'Industry leaders predict shipments of 400,000 units by 1972, pointing out that population trends favor continued growth. * * *'

* * * * *

"* * * The industry seems to have followed a cyclical pattern with the economy rather than the contracyclical pattern followed by conventional home building. The boom in mobile homes has been the greatest during periods in which conventional housing starts were at their lowest ebb.

"* * * Like the conventional home builder, a mobile home manufacturer needs only a little capital to begin production. This keeps him in and out of the business in a pattern similar to the national economy. His influence is readily felt in the industry and he competes vigorously with large firms for a share of the local market.

* * * * *

"* * * [The mobile home industry] has all of the indicators of a sound industry, and its impact will no doubt be felt in the housing market for many years. * * *" (P. 8, 9, 10.)

* * * * *

"It appears that the market for mobile homes speaks for itself without further study. The following general statements are made in summary:

"For the present there are more than five million people who live in mobile homes. This figure includes third generation mobile home dwellers. Indications point to a continued rapid growth in sales. The younger and older segments of our population are increasing rapidly and should continue to find this type of housing desirable. The demand will also be stimulated by the growing number of families purchasing second homes.

"For the immediate future, in addition to the anticipated demand increase mentioned above, we can reasonably expect added use of mobile homes in retirement centers and garden apartments. Government subsidized, low-income housing will make effective use of mobile homes.

"For the long range future, we can anticipate use of mobile homes as yet untried or even heard of. These will include luxury type mobile homes and parks and high rise apartment complexes." (P. 13.)

7. Construction workers were not intended to be exempt from the provisions of the Act. See S.Rep. 1487, 89th Cong., 2d

tion and to extend the exemption beyond that which, in our opinion, was intended by Congress. Our appreciation of the overall purpose of the Fair Labor Standards Act to improve generally the conditions of workers,[8] along with our analysis of the 1966 amendment, causes us to conclude that Section 13(b) (10) was not intended to be interpreted in the broad sense found by the District Court.

Section 13(a) (19),[9] the forerunner of Section 13(b) (10), provided all employees of automobile, truck and farm implement dealers a complete exemption from both the minimum wage and overtime provisions of the Act. In 1966 when the Act was amended to include the present Section 13(b) (10), the provisions of the amendment, while broadening the exemption coverage to the aircraft and trailer industries, had an overall limiting effect. It not only narrowed the group of employees to be exempted to salesmen, partsmen and mechanics, but excluded the former minimum wage exemption applicable to this category of employees. It is apparent that the addition of the aircraft and trailer industries to the exemption was a recognition of certain disadvantages suffered by industries which were comparable to the automotive industries already enjoying the exemption.

The Fourth Circuit very recently had occasion to interpret 29 U.S.C. § 213(b) (10) in the case of D. W. Snell v. Quality Mobile Home Brokers, Inc., d/b/a A to Z Mobile Homes, 4 Cir., 1970, 424 F.2d 233, under circumstances similar to those in the instant matter. In *Snell* the Court affirmed the District Court's decision in favor of an employee who sought to recover unpaid overtime wages and liquidated damages from his employer under the Fair Labor Standards Act. The Fourth Circuit rejected the argument of the employer that Snell was exempt from the overtime provisions of the Act because he was a mechanic primarily engaged in servicing trailers within the meaning of the exemption amendment and held:

> "[I]t is apparent from [the Act's] language and from the legislative history that Congress did not intend to exempt an employee who was primarily engaged in truck driving, construction work, or servicing appliances. Prior to 1966, the Act exempted all employees of automobile, truck, and farm implement dealers. The 1966 exemption named only three specific classes of employees—salesmen, partsmen, and mechanics. As originally proposed, the exemption applied only to selling and servicing automobiles, trucks, farm implements, and aircraft, but an amendment providing for the inclusion of trailers was adopted on the floor of the House. Thus it is plain that Congress intended to bring within the exemption *mechanics who performed the type of work on trailers that other mechanics performed on automobiles, trucks, farm implements, or aircraft.*" (Emphasis supplied.)

Sess., 1966, United States Code Congressional and Administrative News, p. 3006. The opinion of the Special Assistant to the Wage and Hour Administrator, Frederick J. Glasgow, dated August 17, 1967, relied on by appellee, which equates a mobile home with a trailer for purposes of the exemption, is not determinative. Indeed, the Secretary concedes as much. The same Assistant defined the term "mechanic" for purposes of overtime exemption from the Act, on August 4, 1967, by saying:

"The term mechanic means any employee doing mechanical work, such as get ready mechanics, automotive, truck, farm implement, or aircraft mechanics, body or fender mechanics, used car re-

conditioning mechanics and wrecker mechanics. The term mechanic does not include employees primarily performing such nonmechanical work as washing, cleaning, painting, polishing, installing seat covers, dispatching, lubricating, or other nonmechanical work."
91 Wage and Hour Manual, p. 933.

8. 29 U.S.C. § 202 (1964). H.R. 8259 and S. 1086 were introduced in the House and Senate, respectively, on May 18, 1965. Both were prefaced with the language, "A Bill to amend the Fair Labor Standards Act to extend its protection to additional employees, to improve its maximum hours standards, and for other purpose."

9. 29 U.S.C. § 213(a) (19) (1964).

We are in accord with the Fourth Circuit's analysis of congressional intent.[10]

Exemptions from the Fair Labor Standards Act are to be narrowly construed against the employer, upon which the burden rests to show that it comes within the exemption. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 394, 80 S.Ct. 453, 456, 457, 4 L.Ed.2d 393 (1960); Mitchell v. Kentucky Finance Company, 359 U.S. 290, 295, 79 S. Ct. 756, 759, 3 L.Ed.2d 815 (1959); Yogurt Master, Inc. v. Goldberg, 5 Cir., 1962, 310 F.2d 53, 55. The record fails to show that appellee has met the burden of proving that the employees in question are "mechanics," within the restricted and commonly accepted sense which we deem Congress intended, who are primarily engaged in servicing trailers.

Reversed and remanded for whatever wage adjustments are necessary in order to conform with this decision.

---

10. The holding in *Snell* that "duties as a truck driver, construction worker, and appliance serviceman" are not within the exemption accords with our holding here. We do not agree, however, that all get-ready work comes under the exemption. If the phrase modifies the type of mechanical work performed on trailers which is performed by other mehcanics on automobiles, trucks, farm implements, or aircraft, such get-ready work is exempted.