In re Petition of Len B. BLACKWELL for the Estate of Inverworld, Ltd., Debtor in Foreign Proceeding, Debtor.

No. 01–52914.

United States Bankruptcy Court,
W.D. Texas,
San Antonio Division.

Nov. 29, 2001.

---

MEMORANDUM OPINION DENYING MOTIONS TO DISMISS 304 PETITION AND GRANTING CERTAIN RELIEF PURSUANT TO SECTION 304(B)

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for consideration the motion of the following Defendants Jose P. Zollino ("Zollino"), Persimmon Hills, Rio Management Inc. ("Rio"), Palladiem, Ltd. ("Palladium"), and Addison Enterprises, Inc. ("Addison") seeking to dismiss Plaintiff's petition for stay order and for relief under section 304 of the Bankruptcy Code. For reasons set out in this memorandum deci-

sion, the motion to dismiss Plaintiff's petition for stay order and relief under section 304 is denied, and some, but not all, of the relief requested by Petitioner Len Blackwell ("Blackwell") is granted.

## Background

Blackwell, as Liquidator of Inverworld, Ltd. ("Ltd."), filed an application pursuant to Section 304 of the Bankruptcy Code, seeking ancillary relief from this court, in aid of insolvency proceedings pending in the Cayman Islands. The petition also seeks, pursuant to Section 304(b), an immediate stay order of all pending and future proceedings against Ltd. and the turnover of any property belonging to Ltd. or in which Ltd. has any interest, either directly or indirectly. In response, the objecting parties raise a variety of reasons why either the 304 petition should be dismissed or some or all of the relief requested in the petition should be denied. The objecting parties first claim dismissal on grounds of lack of personal jurisdiction due to improper service of the petition. They also claim that the petition fails to state a cognizable claim for turnover relief. In addition, they say that the relief sought cannot be granted because this court lacks subject matter jurisdiction to grant such relief. Each of these issues is addressed in turn.

### A. Personal Jurisdiction

The objecting parties' original response to Petitioner's Section 304 petition was that the court lacked personal jurisdiction over Zollino and Persimmon Hills because they had not been properly served with a summons. Shortly after, Blackwell served a copy of the petition on counsel for Zollino and Persimmon Hills, who had agreed to accept service of summons for both. Therefore, the question of proper service on these two parties is now moot. However, three additional parties joined in raising the personal jurisdiction objection, in an amended response—Rio, Palladiem, and Addison. These entities are all non-U.S. entities, and claim that they were never properly served with the Section 304 petition. Blackwell counters that it is unnecessary to serve these foreign entities in this 304 proceeding, because all of the relief that he seeks is already set forth in a separate adversary proceeding in which they have already been served.

The parties have, by these arguments, conflated a number of discrete issues that need to be teased apart so that they can be properly addressed. In point of fact, three separate questions are presented. First, the court must decide whether a foreign representative must "serve" a petition for ancillary relief as a predicate to obtaining recognition and access to the U.S. courts. Second, we need to determine whether such service must be accomplished as a predicate to the foreign representative's obtaining specific relief under section 304(b). Third, the court has to decide whether such service must be accomplished if the foreign representative has already sought specific relief against a specific party by means of a separate adversary proceeding. When broken down in this way, the problem begins to yield answers almost as soon as the questions are framed.

As to the first question (whether service of process is a necessary prerequisite to a foreign representative's obtaining recognition pursuant to section 304(a) of the Bankruptcy Code), the answer seems to be yielded both by the text of the section, and by the structure of the Bankruptcy Code itself. Section 304(a) permits a foreign representative to petition a U.S. Bankruptcy Court for ancillary relief by simply filing a petition (and being qualified as a foreign representative). It does not impose a service obligation on the foreign

representative. Neither do any of the Bankruptcy Rules which implement that section. Rule 1018 states that, in the case of a contested petition for ancillary relief, certain of the adversary rules apply but, significantly, Rule 7004 (relating to proper service of process) does *not* apply.[1]

Service of process does not apply to ancillary petitions for the same reason that it does not apply to voluntary bankruptcy petitions. The structure of our insolvency law is such that a case may be *commenced* by the mere filing of a petition. No "adjudication" is required under our law. No "contested matter" is initiated by the act of filing a petition. We say that the debtor is "in bankruptcy" by the simple act of filing. Similarly, an ancillary proceeding, according to the plain language of section 304(a), "is commenced" by the simple act of filing the petition. Because no service is required as a predicate to commencement, no creditor can challenge the legitimacy of the filing of ancillary petition on grounds of lack of service.[2]

Questions of personal jurisdiction and service do become relevant when a foreign representative seeks affirmative relief against a particular party or group of parties. But here too one must distinguish between the right to obtain access to the courts for purposes of obtaining the relief and the subsequent application of the power of the court as against a particular party once that access has been granted. Notions of due process only come to the fore at the point when a particular person is "haled into court." *See World–Wide*

*Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980). At that point, the court must be satisfied that the affected party has been afforded appropriate notice and opportunity to be heard, and that the exercise of jurisdiction over that party does not offend traditional notions of justice and fair play. *See International Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct., 154, 160, 90 L.Ed. 95 (1945). Indeed, the Bankruptcy Rules specifically contemplate service of process with respect to those parties against whom specific relief is sought pursuant to Section 304(b). *See* FED.R.BANKR.P. 1010. That Rule directs that service be accomplished in accordance with Rule 7004. However, the Rule also says that, if service cannot be accomplished by summons, then "the court may order that the summons and petition be served by mailing copies to the party's last known address, and by at least one publication in a manner and form directed by the court." Rule 1010. Anticipating the more technical arguments advanced by the objecting parties here, the rule also says that "[t]he summons and petition may be served on the party *anywhere.*"

This brings us to the third issue. As it turns out, there is no need to address whether service of the section 304 petition did or did not comply with the requisites for service spelled out in Rule 1010 in the context of the section 304 petition itself, because the objecting foreign parties are *already* parties to the companion adversary proceeding. It is by means of that

---

**1.** Indeed, for that matter, neither does Rule 7012, the rule pursuant to which the objecting parties have here sought dismissal.

**2.** This is not to say that a party cannot later challenge a petition on grounds of lack of eligibility. For example, a party might later maintain that the foreign representative is not in fact a proper foreign representative, as that

term is defined in our Bankruptcy Code. Or the party might challenge the circumstances surrounding the legitimacy of the filing of the proceeding in the foreign jurisdiction. These are not *jurisdictional* challenges, however. Cf. *Matter of Phillips,* 844 F.2d 230, 235 (5th Cir.1988) (challenges to eligibility under section 109 are not jurisdictional).

adversary proceeding that Blackwell is already seeking specific relief against these parties, both in the form of an injunction and in the form of a request for turnover of property. The right place to challenge personal jurisdiction and service of process in this case is not in the context of this ancillary petition but rather within the adversary proceeding itself. The parties here objecting are named defendants in that adversary proceeding and have already raised just such a challenge in that context. That is where the issue is properly raised, and that is the proper procedural vehicle through which it will be addressed.

■ It is important to address Blackwell's contention that he can seek generic injunctive relief and turnover relief in the petition for ancillary relief itself, without the necessity of bringing a separate adversary proceeding. Blackwell cites to COLLIER, which states that "although certain kinds of relief which are available under Section 304 are identified in Bankruptcy Rule 7001 as matters which require the commencement of an adversary proceeding ... when the initial petition commencing an ancillary case requests such relief it would be duplicative and wasteful to require a separate, additional adversary compliant seeking the same relief." COLLIER ON BANKRUPTCY, ¶ 304.03[3] (15ed.1997). This court agrees as a general principle with the "judicial economy" analysis advanced by COLLIER. When, for example, the foreign representative seeks a generic stay of actions against creditor collection actions against property of the estate located within the United States, no separate adversary proceeding ought need to be filed. A generic stay does no more than extend to the foreign representative the sort of relief that the United Nations Commission on International Trade Law has recommended ought to be granted as a matter of course whenever a foreign representative (otherwise qualified) seeks assistance from any court in any country. *See* UNCITRAL MODEL LAW ON CROSS BORDER INSOLVENCY, ART. 20 at 10–11 U.N. Sales No. E.99.V.3 ISBN 92–1–133608–2 (1999). Of course, once such relief is afforded, the foreign representative must then take the appropriate steps to give notice to all parties intended to be affected by such a stay, and the court must give such parties the opportunity to challenge the stay, all consistent with notions of due process. To achieve that end, when a stay order is sought to be enforced against a specific party, service consistent with Rule 1010 would seem to be required.

Other kinds of more specific relief, by contrast, ought more properly to be brought in the form of an adversary proceeding. The foreign representative here seeks "turnover" of property, for example. The petition itself is so generic on this point that it could not be enforced without violating due process.[3] As and when specific property is found in the hands of specific persons, an adversary proceeding can (and should) then be filed.[4] As it turns out, Blackwell has already asked for more specific turnover relief in the adversary proceeding, so it is unnecessary to use the ancillary petition itself as the vehicle for obtaining turnover.

---

3. The petition simply asks, as part of its generic relief, for turnover of all property of the insolvency estate located within the United States.

4. There are two reasons why this procedure is not unfair to the foreign representative. Firstly, Rule 1010 already imposes service of process obligations that are substantially similar to those already required for adversary proceedings. Secondly, the specificity required in an adversary proceeding would be required as a matter of pleading in the ancillary petition itself anyway, as a matter of due process.

For all of these reasons, the objecting parties' complaints about lack of personal jurisdiction and lack of proper service of process are inapposite as grounds for either denying ancillary relief to the foreign representative or dismissing the ancillary petition. Those grounds are overruled.

### B. Subject Matter Jurisdiction

On June 21, 2001, this court dismissed Plaintiffs' First Amended Complaint for lack of subject matter jurisdiction over Ltd.'s claims against some of these objecting parties because Ltd. was apparently trying to bring those actions under the aegis of the section 304 ancillary proceeding of I.G. Services, Ltd. ("IGS"), another affiliate currently undergoing liquidation in the Cayman Islands. The court ruled that, if Ltd. wanted to avail itself of the assistance of the U.S. Bankruptcy

Court, it needed to bring its own section 304 petition.[5] On the same day, Blackwell, unaware of the court's ruling, filed an ancillary petition on behalf of Ltd., in his capacity as liquidator for that entity.[6] When Blackwell learned about this court's June 21st ruling, Blackwell filed a motion to reconsider, which this court granted. The objecting parties re-urged their same objections to Blackwell's adversary proceeding, including challenges to jurisdiction. They also contested this ancillary petition, challenging both the propriety of granting the petition and challenging this court's subject matter jurisdiction to entertain the relief Ltd.'s representative is now seeking.

As with the previous set of objections, here too we need to break down the arguments in order to lead to a more cogent

---

**5.** Blackwell claims that his First Amended Complaint on behalf of IGS and Ltd. constituted a section 304 ancillary proceeding petition on behalf of Ltd. Blackwell even cites to COLLIER which states that "although certain kinds of relief which are available under Section 304 are identified in Bankruptcy Rule 7001 as matters which require the commencement of an adversary proceeding ... when the initial petition commencing an ancillary case requests such relief it would be duplicative and wasteful to require a separate, additional adversary complaint seeking the same relief." COLLIER ON BANKRUPTCY, ¶ 304.03[3] (15 ed.1997). This court agrees with the "judicial economy" analysis found in COLLIER, and to the extent that the June 21 order can be read to require a foreign representative to first file a 304 petition and then, at a later date, file a complaint, that portion of the opinion is abrogated. Nevertheless, this is not what Blackwell did in his First Amended Complaint. Blackwell chose to file Ltd.'s complaint in IGS's ancillary proceeding, specifically alleging jurisdiction under Blackwell's *future intent* to file a section 304 petition on behalf of Ltd. It was not until Defendants pointed out this jurisdictional defect in their motion to dismiss (*i.e.,* you cannot confer subject matter jurisdiction on a court based on an act that has not yet taken

place), did Blackwell, in his response to Defendants' motion to dismiss, allege that Ltd.'s complaint brought within IGS's ancillary proceeding was *itself* Ltd.'s 304 ancillary petition. As pointed out in this court's June 21 decision. Blackwell's position cut too many jurisdictional corners for this court to ignore. First, Blackwell only raised its ancillary proceeding argument in response to Defendants' motion to dismiss, *not* in Blackwell's actual complaint. Second, Blackwell was bringing Ltd.'s claim in IGS's ancillary proceeding, as the case number on the complaint clearly indicated. Finally, Blackwell admitted in numerous places in its First Amended Complaint that it had *yet* to bring an ancillary proceeding on behalf of Ltd. Indeed, at a hearing after the First Amended Complaint was filed, the court inquired as to why Ltd. had *not* filed an ancillary proceeding. Counsel for Blackwell responded that it would do so *shortly* (not that Blackwell thought that the First Amended Complaint constituted such). This court well understands the "judicial economy" concerns raised in COLLIER, but "judicial economy" does not justify cutting subject matter jurisdiction corners.

**6.** Insolvency proceedings were opened on behalf of Ltd. in the Cayman Islands, and Blackwell was appointed as a liquidator.

analysis. The objecting parties first challenge Blackwell's right to qualify for ancillary relief. Second, they challenge the court's subject matter jurisdiction to grant the relief Blackwell seeks in the ancillary petition.

### 1. Prerequisites of a Section 304 Petition

The objecting parties first contend that Blackwell is not, in fact, authorized to seek ancillary relief, arguing that a proper shareholders' meeting was never held to authorize the resolution to seek relief in the first place. To evaluate this objection, we need to return to first principles.

■ Section 304[7] of the Bankruptcy Code enables a foreign representative to commence a case ancillary to a foreign proceeding[8] by filing a petition with the United States Bankruptcy Court. To qualify for ancillary relief, there must first be a "foreign proceeding" and the party seeking relief must be a "foreign representative" as defined by Section 101 of the Bankruptcy Code. If both of these prerequisites are met, a bankruptcy court has little, if any, discretion under the Bankruptcy Code but to admit the Section 304 petition. *See In re Fracmaster, Ltd.*, 237 B.R. 627, 632 (Bankr.E.D.Tex.1999).[9]

#### a. Foreign Proceeding

■ On November 24, 2000, Christopher Johnson, on behalf of Ltd., filed a Petition with the Grand Court in the Cayman Islands seeking court supervision of the liquidation of Ltd. Subsequently, Jose Zollino and certain other related parties filed an objection in that court proceeding, challenging the entry of an order by the Cayman Court granting the petition. The Court held a hearing on the objection in late January 2001. Mr. Zollino appeared through counsel, and presented his arguments. The Grand Cayman Court, after considering the arguments, rejected Mr. Zollino's arguments and entered a preliminary order approving court supervision of the liquidation of Ltd. That order has since become final because Zollino failed to pursue his opposition (though he had the opportunity). By virtue of that order, proceedings were commenced, and both Johnson and Blackwell were appointed as Joint Official Liquidators of Ltd.

The foregoing facts establish that Ltd., a registered Cayman Islands corporation, is undergoing a court-supervised liquidation in the Grand Court of the Cayman Islands otherwise known as "Winding Up By Court." Under Cayman Islands Companies Law,

---

**7.** 11 U.S.C. § 304.

**8.** Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as a "...proceeding whether judicial or administrative and whether or not under bankruptcy law, in a foreign country in which the debtor's domicile, residence, principal place of business, or principal assets were located at the commencement of such proceeding, for the purpose of liquidating an estate, adjusting debts by composition, extension, or discharge, or effecting a reorganization."

**9.** More properly, the court has little discretion to do more than overrule the objection of whomever is contesting the petition. As earlier noted, an ancillary action is commenced by a filing *vel non*. If no one contests the petition, then the foreign representative is presumed to be entitled to recognition by the court (though the court may, for other reasons, elect not to grant some of the relief that representative seeks pursuant to section 304(b)). Here, there has been a contest, so the judicial task for the court is to decide whether to *dismiss* the petition on grounds, essentially, of lack of eligibility. Though the case law is less than enlightening on the issue of burdens, it would seem most sensible that, once an objection is raised, the burden of proof lies with the foreign representative to establish his or her "credentials," as it were. In most cases, that will not be difficult to do.

"creditors and/or contributories seeking entry of an order winding up a company can do so only by petitioning the Grand Court of the Cayman Islands (the 'Cayman Court'). If the petition is granted and an order is made for winding up the company, the Cayman Court oversees all aspects of the liquidation. This procedure is known as a 'Winding Up By Court.' "

See *In re Petition of Tam*,[10] 170 B.R. 838, 840 (Bankr.S.D.N.Y.1994) (citing §§ 93, 95 of the Cayman Islands Companies Law). Such proceedings thus qualify as a "foreign proceeding" within the meaning of Section 101(23). *See* 11 U.S.C. § 101(23); *Petition of Tam* at 840 (citing *Universal Casualty & Surety Co. v. Gee (In re Gee)*, 53 B.R. 891, 897 (Bankr.S.D.N.Y.1985)) (a "Winding Up By Court" under the Cayman Islands Companies Law is a "foreign proceeding").

■ It is entirely inappropriate for this court to second guess the decision of the Grand Cayman's Court regarding whether it was or was not appropriate to open insolvency proceedings, though that is what the objecting parties are suggesting this court do. The right and only court to rule on the propriety of given proceedings in a given country is the court in that country assigned the duty to rule on such matters. This court has no more right to entertain collateral attacks on that court's ruling than it does to entertain collateral attacks on the rulings out of the state courts in this country. What is more, this court is in a far worse position to evaluate the evidence and arguments that may be presented in light of applicable Cayman Islands law than is the court that sits in the jurisdiction where that law is to be applied and employed.[11]

Basic principles of comity also support this court's election not to entertain a collateral challenge to the Cayman court's rulings. This court has been presented with no evidence (and no credible argument) that the courts of the Cayman Islands are courts to which this court would not or should not extend recognition and cooperation in the interests of comity. This court doubts that any such evidence could ever be mustered. There may, in fact, be courts in some countries to which we should not extend comity. Their proceedings may be so facially sham, or so patently corrupted, or so far removed from what humans on this planet might recognize as the administration of justice that to accord their rulings and proceedings recognition would only perpetrate an injustice. Unfortunately, history and current events have shown us that, indeed, such affronts to justice do exist on our planet, and no high-minded principles of international cooperation should ever overcome an American court's refusal to allow itself to

---

10. In *In re Petition of Tam,* where the liquidation of a Cayman Islands corporation was conducted without any regulatory oversight from the Cayman Court, the Court held that the voluntary winding up of a Cayman Islands corporation was not a "foreign proceeding" within meaning of the Bankruptcy Code.

11. The proposition should be self-evident, but if it is not, then simply imagine a U.S. panel trustee seeking ancillary relief in some other country, and imagine the courts of that country entertaining an argument that the case in this country was an invalid foreign proceeding because there had been no "adjudication" like there would be in the other country (our law does not require adjudication as a predicate to commencement of proceedings). Or imagine the self-same facts presented here—a challenge mounted in this country to the authority to file the case. Let's say that the challenge is dropped, so that the case proceeds in this country, and a duly appointed trustee then seeks ancillary relief in some other country. Now imagine that country's court entertaining a renewed challenge to the authority of the debtor to file, as a basis for denying ancillary relief.

be exploited by cooperating with such tribunals. Drawing those lines will always be difficult, sensitive, and always easily subjected to hind-sighted criticism. That the task is difficult does not mean that it is impossible, however, and it certainly does not mean that the court can shirk its duty just because the job is hard to do.

Happily, this case does not present the court with such a difficult exercise. The courts of the Cayman Islands follow common law principles drawn from Great Britain, and their court system also resembles that found in other Commonwealth countries.[12] Just as U.S. courts traditionally extend comity to the decisions of Great Britain, the courts traditionally extend the same courtesy to the courts of the Cayman Islands. *See In re Ionica PLC*, 241 B.R. 829, 835 (Bankr.S.D.N.Y.1999) (noting that the laws of the United Kingdom, and specifically its insolvency laws, are generally afforded comity, as are the insolvency laws of the other common law jurisdictions derived from British law); *see also In re Gee*, 53 B.R. at 901 *citing Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 630 (2nd Cir. 1976)(where the foreign proceedings are in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed). Once comity is so extended, then permitting these objecting creditors to mount their challenge in this court would be a gratuitous insult to the Grand Court of the Cayman Islands. That the court has not the least desire or need to do. That court's decision stands, and is thus binding in this proceeding. The first essential finding for a representative's qualifying for ancillary relief is thus satisfied.

### b. Foreign Representative

■ Section 101(24) of the Bankruptcy Code defines a "foreign representative" as a "duly selected trustee, administrator, or other representative of an estate in a foreign proceeding." 11 U.S.C. § 101(24). Both Johnson and Blackwell, after a contested "ownership" dispute in the Grand Court of the Cayman Islands, were appointed as the Joint Official Liquidators for Ltd.[13] This appointment by the Grand Court is sufficient to confer "foreign representative" status on both Johnson and Blackwell within the meaning of section 101(24). *See In re Gee*, 53 B.R., at 897. Therefore, the second element for qualifying for ancillary relief is thus also satisfied.

The two prerequisites for granting relief under section 304 have thus been met. As the court ruled in *Fracmaster*, once these predicates are established, a bankruptcy court has little discretion not to admit the petition. Indeed, a court also has little reason not to accept the petition for ancillary relief.[14]

---

12. Jamaica and the Cayman Islands are part of the Commonwealth Caribbean, whose similar legal systems derive from those of Great Britain. *See Reid–Walen v. Hansen*, 933 F.2d 1390, 1399 (8th Cir.1991) *citing* Modern Legal Systems Cyclopedia: The Legal Systems of the Commonwealth Caribbean ¶ 7.80.7 § 1.1 (1988) (K. Redden, ed.).

13. Pursuant to § 105 of the Cayman Islands' Companies Law, the court may appoint an official liquidator to conduct the winding up. *See In re Petition of Tam*, 170 B.R. 838, 840 (Bankr.S.D.N.Y.1994)(citing from the Cayman Islands Companies Law.)

14. Recent developments in international insolvency law and practice strongly favor granting recognition with a minimum of procedural impediments. *See* UNCITRAL MODEL LAW ON CROSS BORDER INSOLVENCY, *supra* at 28–29; *see also* AMERICAN LAW INSTITUTE, TRANSNATIONAL INSOLVENCY PROJECT, PRINCIPLES OF COOPERATION IN TRANSNATIONAL INSOLVENCY CASES AMONG THE MEMBERS OF THE NORTH AMERICAN FREE TRADE AGREEMENT, at 47–50 (Tentative Draft, April 14, 2000).

## 2. The Scope of Subject Matter Jurisdiction in § 304 Proceedings

■ With the prerequisites of Section 304(a) satisfied, we next examine the scope of jurisdiction conferred by the opening of such a proceeding. At the outset, we can state the obvious. The court has subject matter jurisdiction to entertain the ancillary petition. Section 1334(a) of Title 28 gives district courts (and, by reference, bankruptcy courts) jurisdiction over cases filed under title 11. For purposes of the jurisdictional statute, an ancillary proceeding is a "case" within the meaning of § 1334(a). It is true that the actual "bankruptcy case" (main proceeding) is pending in another country, but for purposes of jurisdiction, the ancillary action is as much a "case" as is a full-blown voluntary proceeding filed in this country.[15]

There are still legitimate subject matter questions, relating to the scope of relief that can be accorded to a foreign representative under section 304(b), however. The statute itself says that a foreign representative may obtain a stay of actions against the foreign debtor with respect to its property, and a stay of actions against the property itself. A foreign representative may also seek turnover of property of the foreign debtor to the foreign representative. Such causes of action, because they are specified in section 304 itself, "arise under" the Bankruptcy Code and so fall well within the subject matter jurisdiction of the federal courts. *See* 28 U.S.C. § 1334(b); *see also In re Madison*, 249 B.R. 751, 755 (Bkrtcy.N.D.Ill.,2000) (adversary proceeding is said to "arise under" Title 11 if it pleads a cause of action created or determined by the Bankruptcy

Code). Problems can arise under section 304(b)(3), however, which says that a court can grant "other appropriate relief." Conceivably, this language could spread the mantle of "arising under" subject matter jurisdiction to cover virtually any cause of action that a court might decide to entertain.

Fortunately, Blackwell has restricted his requests for substantive relief to a request for a stay and a request for turnover of property, both located well inside the jurisdictional tent. His request of "other appropriate relief," on the other hand, is generic and contentless. With regard to the request for turnover, due process considerations suggest that the better procedural mechanism for obtaining specific relief—especially with respect to turnover of property—will often be the instigation of an adversary proceeding (which is what Blackwell has done here, repeating in greater detail his request for turnover in the adversary proceeding previously filed by IGS' liquidators against Zollino and others). The subject matter conclusion will be precisely the same, regardless the procedural vehicle. Because Blackwell does not seek any other specific relief, the request for generic "other appropriate relief" can be denied for the moment, sparing the court (at least for now) the difficult subject matter jurisdiction questions that lay in wait in that particular thicket.

## C. Granting Relief Under § 304(b)

■ With the preliminary issues now behind us, we can now turn to the question whether specific relief should actually be granted to the foreign representative under Section 304(b). As already

---

**15.** Though not dispositive, it is worth noting the way Congress structured chapter 3 of title 11. Section 301 discusses voluntary petitions, section 302 covers joint petitions, section 303 governs involuntary petitions. Section 304, then, covers ancillary proceedings. The logic of placement suggests that Congress thought that an ancillary petition was another kind of "case," governed by section 1334(a) of title 28.

noted, Section 304(b) gives bankruptcy courts the discretionary power to order a wide range of relief. A court can enjoin all actions against a foreign debtor or against property of the debtor involved in the foreign proceeding. It can order the turnover of all property of the debtor to the foreign proceeding or it can order other appropriate relief. *See* 11 U.S.C. § 304(b). In exercising this discretionary power, the bankruptcy courts are to be guided by "what will best assure an economical and expeditious administration" of the foreign estate, consistent with the factors specified in Section 304(c). *See* 11 U.S.C. § 304(c). Thus, in deciding whether to grant relief under Section 304(b), courts are to use the factors in Section 304(c) as guidelines. The Section 304(c) factors are "designed to give the court maximum flexibility in handling ancillary cases." *See In the Matter of Culmer*, 25 B.R. 621, 627 (Bankr. S.D.N.Y.,1982) quoting H.R. No. 95–595, 95th Cong. 1st Sess. 324–325 (1977), S.Rep. No. 95–989, 95th Cong., 2nd Sess. (1978) 35, U.S.Code Cong. & Admin.News 1978, p. 5821. However, neither section 304(c) nor its legislative history specifies the weight to be given to the six factors. *See In re Gee*, 53 B.R., at 901. Nonetheless, courts generally give the greatest weight to the "comity" factor, because most of the other factors are taken into account when considering comity and are used as a basis in deciding whether or not to accord comity. *See In re Koreag, Controle et Revision S.A.*, 130 B.R. 705, 712 (Bankr. S.D.N.Y.,1991), *vacated on other grounds*, 961 F.2d 341 (2nd Cir.1992).

 Perhaps because *Collier* almost advises an elision, courts tend to slide together the analytically separate issues of recognition (a section 304(a) question) and relief (a section 304(b) question). While it is perfectly understandable why this often happens, it can lead to problems. A for-

eign representative will often commence an ancillary proceeding with the express purpose of staying a particular collection action, or recovering a specific item of property. *See, e.g., Petition of Saleh*, 175 B.R. 422 (Bankr.S.D.Fla.1994) (foreign representative brought ancillary proceeding to enjoin creditor action against assets located in the United States); *In re Treco*, 229 B.R. 280 (Bankr.S.D.N.Y.1999) (official liquidators of foreign debtor brought case ancillary to foreign proceeding to obtain turnover of debtor's property in the United States); *In re Thornhill Global Deposit Fund, Ltd.*, 245 B.R. 1 (Bankr.D.Mass. 2000) (official liquidators charged with the compulsory winding up of foreign debtor pursuant to Bahamian law filed petition for case ancillary to foreign proceedings, in which they sought entry of order enjoining further actions against debtor in the United States and compelling turnover of debtor's United States assets). If the petition and its attendant relief are contested, then the court will typically decide whether to grant or dismiss the ancillary petition based on whether the specific relief being requested passes muster under the six guidelines set out in section 304(c). Thus, the court will often decide whether to dismiss the whole proceeding based on the court's evaluation whether the specific relief being sought by the foreign representative is justified. In this way, courts often end up applying the § 304(c) guidelines not just to the request for relief (governed by section 304(b)) but to the request for recognition as well—technically a section 304(a) question. In cases in which the foreign representative seeks but a single remedy, no great harm is done. If, however, the foreign representative expects to bring a broad panoply of actions under the aegis of the section 304 proceeding, then a court should not dismiss the entire proceeding simply because it concludes that a particular form of relief

sought *within* that proceeding might not be appropriate to grant.[16]

The Inverworld cases are a good example of why eliding the two issues (denial of specific relief and dismissing the entire proceeding) is not always wise. Indeed, the Inverworld cases may be the best exemplars for why such elision is almost never wise. In IGS, for example, the main proceeding was pending in the Cayman Islands, and an ancillary petition was filed in this court. At the same time, an involuntary petition was filed against IGS by certain investors. Within a month, a receivership was also initiated (by the S.E.C.) in federal district court. It became evident within a very short period that a coordinated approach had to be developed to deal with three pending cases—in addition to the companion cases filed by or against IWG Services, Ltd. ("IWG"), a United Kingdom registered company set up in 1997 to provide investment services and to act as a financial intermediary for Mexican and Latin American investors. The initial ancillary petitions for both IGS and IWG sought, primarily, a stay of collection actions and litigation against property of the debtors. Yet, within just a few months, the parties realized that some court would also have to adjudicate the claims of some investors who contended that their proprietary interests in their investment accounts ought to permit them to extract those accounts from IGS or IWG. The dispute raised extraordinarily challenging questions about choice of law and choice of forum, compounded by the possibility that courts in three different countries might reach different conclusions on those questions. The parties elected to use the ancillary petitions as a vehicle with which to craft a solution to the claims questions. That use of the ancillary forum had not been contemplated when the original ancillary petitions were filed. As it turned out, the court had initially granted ancillary relief, entering a stay order as originally requested. But suppose that, instead, the court had determined that the relief initially being sought was inconsistent with section 304(c)—and had then dismissed the petitions! The foreign representative would have instantaneously lost the local forum, and would have had to have filed a *new* section 304 petition (under a new case number, no less) in order to obtain any further relief that the foreign representative might later discover would be needful.

The "fix" for this problem is a simple one. Courts need merely recognize the difference between evaluating the particu-

---

16. The analogy to ordinary bankruptcy cases quickly demonstrates why it is important not to use the section 304(c) standards to evaluate whether the entire section 304 petition should be dismissed. A debtor seeks post petition financing, but fails in its effort. Though such a ruling may, as a practical matter, end the prospects of reorganization, no one would conclude that the *legal* impact of the ruling ought to be dismissal of the case. The debtor might well get financing from another source, or enter a nonoperational sell-off mode, yet still do so under the aegis of the case. In the same way, a court might well turn down a foreign representative's request for specific relief, on grounds that the request fails to pass muster under the standards of section 304(c), while declining to dismiss the proceeding itself. Perhaps the foreign representative, for example, sought turnover of a particular item of property which the court declined to grant. The foreign representative might nonetheless still need the assistance of the court on an ongoing basis to stay collection action against other pieces of property located within the jurisdiction of the proceeding. It is true that, in many cases, a foreign representative initiates a section 304 proceeding to obtain only a narrow, specific remedy, such that, if the remedy is denied, then the *raison d'etre* for the proceeding and with it any further need to maintain the proceeding. That will not always be the case however.

lar relief being sought by a foreign representative and determining whether recognition is even appropriate. The statute itself makes it fairly clear that entirely different standards apply to these two discrete determinations. A court might thus very well, on comity grounds, conclude that the particular relief sought by a foreign representative should not be granted, yet still conclude—again on comity grounds—that a legitimate foreign proceeding had been commenced and that the foreign representative before the court properly qualifies as such under section 101(23). In such circumstances, the correct choice for the court would be to deny the relief sought but *not* to dismiss the ancillary case.

Indeed, that is the approach that this court has followed here. An earlier section of this opinion has already concluded that there are no grounds for *dismissing* *this* ancillary proceeding because (a) there is pending a legitimate "foreign proceeding" and (b) the representatives before the court qualify as legitimate "foreign representatives" within the meaning of § 101(23). *See* discussion *supra; see also* *In re Fracmaster, Ltd.,* 237 B.R. 627, 632

(Bankr.E.D.Tex.1999). In reaching that conclusion, this court did rely on principles of comity to conclude that it ought to defer to the Cayman court's ruling about the legitimacy of opening the case there. The court did not, however, rely on the section 304(c) factors because, in this court's view, they are not (at least technically) relevant to the issue of recognition, which is after all the only issue presented under section 304(a) when a petition is challenged. There will, of necessity, be overlap between the recognition issue and the relief issue (i.e., the section 304(b) requests), because comity is likely to be relevant in both inquiries. We should not make the mistake, however, of thinking that, because comity is relevant in both inquiries, they are therefore the same inquiries. They are not.[17]

■■ With this predicate *caveat,* we can look to the case law for assistance in deciding whether the foreign representative in this case ought to be granted the relief he has sought in this petition. The liquidator first asks for a general stay of all actions.[18] The scope of the stay requested is limited by its terms to apply to those with actual notice of the stay order, though the scope

17. The bankruptcy court in *Petition of Tam* recognized the same problem, though in the opposite direction. There, the foreign representative made a strong case for why relief would be appropriate under § 304(b), eliding the important preliminary question whether there was a *legitimate* "foreign proceeding" to support maintenance of an ancillary proceeding pursuant to § 304(a). Said the court: [W]e cannot consider the merits of Tam's petition—however compelling they may appear—without first finding that the Cayman Liquidation is a foreign proceeding. To do otherwise effectively writes § 304(a) out of the Code in violation of the general rule that "a court should not construe a statute in a way that makes words or phrases meaningless, redundant or superfluous." *In re Petition of Tam,* 170 B.R. 838, 846 (Bankr. S.D.N.Y.1994) (citations omitted).

18. The precise request reads as follows: "The petitioner seeks and immediate stay order, affording a stay of all pending and future proceedings against Ltd. . . . If Ltd. is not afforded a stay of all proceedings, then the courts around the United States could enter judgments against Ltd.'s property exceeding sums that would otherwise be granted had Ltd. been able to properly defend those actions." Section 304 Petition, at para. 17. The precise language sought in the stay order is proposed as follows:

The commencement or continuation of any and all actions against Ltd. and any of its affiliates and/or against any property of Ltd. wherever located in the United States of America, or against any person or entity who is being defended by, or who claims indemnity against, Ltd. and its affiliates. Id., at para. 20.

is broadly drawn to extend protection to "entities being defended by, or who claim indemnity against, Ltd. and its affiliates." The request for stay is couched as "preliminary," subject to becoming final and permanent upon final hearing.

The second request in the petition is for turnover of property. This request is contained in a single paragraph:

Bankruptcy Code section 304(b)(2), Petitioner hereby requests that the court, after notice and a hearing, order turnover of any property belonging to Ltd., or in which Ltd. has any interest, either directly or indirectly, or any contingent or reversionary interest, in trust or otherwise, held by any person or entity to be turned over to the Petitioner as the foreign representative of Ltd. for further proceedings and administration in the proceedings in the Cayman Islands.

Section 304 Petition, at para. 22.

There is a third "generic" request for "other appropriate relief," but this request ask for nothing specific. Instead, this request simply sets out an "aspirational" request: "...that the Court enter all other appropriate orders authorizing the Petitioner to carry out this ancillary proceeding, or for the administration or disposition of the property of Ltd. or of any other assets or property of Ltd." *Id.*, at para. 23.

In evaluating these three requests, a court must look to the six guidelines found in section 304(c). At the outset, we can most quickly dispose of the most important factor, comity, because it involves an overall evaluation of the judicial actions of the Cayman Islands. Comity, historically, has been defined as "[t]he recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its

laws." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 143, 40 L.Ed. 95 (1895); *see also Philadelphia Gear Corp. v. Philadelphia Gear de Mexico, S.A.*, 44 F.3d 187, 191 (3rd Cir.1994). In this case, we are asked whether granting stay relief, turnover relief, and "other appropriate relief" designed to aid the foreign representative in efficiently administering assets is consistent with these principles. Part of the analysis turns on whether a proceeding pending under the Companies Law of the Cayman Islands is the sort that ought to be accorded the kind of cooperation contemplated by the principles of comity spelled out in *Hilton v. Guyot*. Ours is not the first court to deal with that issue, and it makes sense to follow the lead of other courts that have already decided the issue with respect to Cayman Islands law.

In *In re Gee*, the bankruptcy court for the Southern District of New York was presented with a section 304 petition which requested discovery, preliminary injunctions against specific persons from disposing of assets, books and records, and a request for turnover directed to specific parties, seeking turnover of both property and books and records. Judge Tina Brozman analyzed the request using the guidelines found in section 304(c). She noted that the Cayman Islands Companies Law was similar to the U.S. Bankruptcy Code and that the debtor had shown nothing to persuade her that fundamental standards of fairness were abridged by the Cayman Islands tribunal. *See In re Gee*, 53 B.R. at 902. The court then found that the Companies Law provided substantially the same protection as the Bankruptcy Code, and so concluded that a claim for relief under section 304(b) would be appropriate to grant. Said the court:

Turning to subsections (1) and (2) of section 304(c), ... a review of the [Cayman Islands] Companies Law does not

reveal provisions which would prejudice United States claimants or create unjust treatment of the estate's creditors. Creditors may submit proofs of claim until the bar date which is set by the Court; the Companies Law does not appear to mandate physical appearance by the creditor (Companies Law §§ 118 and 158). There is no statutory provision which prefers the claims of Cayman Islands citizens or residents or disfavors the claims of non-Cayman Islands citizens or residents. Section 304(c)(3) is also satisfied by virtue of section 165 of the Companies Law which voids "fraudulent preferences." Finally, ... section 304(c)(4), which directs this court to consider whether the distribution of proceeds of the estate will be substantially in accordance with that of the Bankruptcy Code, the court concludes that the Companies Law is generally in harmony with the Code. Rates, taxes, assessments and certain wages are accorded priority; other claims are paid in full or compromised, all of which is done with sanction of the court. (Companies Law §§ 159 and 160).

*See Id.* at 903–04. The court also noted that the Cayman Islands' Companies Law need not be a carbon copy of the Code: "rather it must be of a nature that is not repugnant to the American laws and policies—and clearly it is not." *See id.* at 904. Finally, the court noted that, "where the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, exceptions to the doctrine of comity are narrowly construed." *See id.* at 901.

Another judge of the same court also looked at Cayman Islands Companies Law, reaching a similar conclusion as to the Winding Up By Court procedure that was at issue in both *Gee* and our case. *See In re Petition of Tam,* 170 B.R. 838, 846 (Bankr.S.D.N.Y.1994). The court declined

to reach the section 304(b) issues in that case, however, because it first concluded that a *voluntary* winding up under the Companies Law did *not* qualify as a foreign proceeding for purposes of § 304(a). *See id.* As part of its analysis, the court drew a distinction between the voluntary winding up being urged as a basis for recognition and the Cayman Islands Winding Up By Court proceeding, the latter of which the court noted *would* qualify as a foreign proceeding for purposes of section 304(a).

Both *Gee* and *Tam* confirm that Cayman Island proceedings conducted under the "Winding Up By Court" chapters of the Companies Act are appropriate candidates for extending comity and cooperation via section 304(b). To complete the analysis, however, a court must measure the specific relief being requested against the guidelines in § 304(c).

The first request, a generic stay, will certainly best assure an economical and expeditious administration of the estate in the Cayman Islands. *See* 11 U.S.C. § 304(c)(1). Indeed, it has been said that a stay of proceedings is one of the essential elements to any insolvency proceeding, tending to assure both the preservation of assets and an equitable distribution among creditors. *See* AMERICAN LAW INSTITUTE, TRANSNATIONAL INSOLVENCY PROJECT, PRINCIPLES OF COOPERATION IN TRANSNATIONAL INSOLVENCY CASES AMONG THE MEMBERS OF THE NORTH AMERICAN FREE TRADE AGREEMENT, § 5 Rec. 5 (Tentative Draft, Apr. 14, 2000) (approved, May 16, 2000)(forthcoming); UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY WITH GUIDE TO ENACTMENT, Ch. 3 Art. 20, U.N. Publication, Sales No. E.99.V.3 (1999). The UNCITRAL Guide to Enactment specifically focuses on the importance of a prompt stay in both ancillary and parallel proceedings

as an antidote to opportunistic behavior that would otherwise take advantage of the jurisdictional limitations endemic to cross-border insolvency cases.[19] The request for stay relief sought here is thus entirely consistent with achieving just treatment of claims (§ 304(c)(1)), the prevention of preferential or fraudulent disposition of property of the estate (§ 304(c)(3)), and the achievement of a distribution of assets substantially in accordance with the distribution scheme available under U.S. insolvency law (§ 304(c)(4)).[20]

Finally, the Companies Law does not discriminate against foreign creditors in the presentation of their claims in a Cayman Islands proceeding, assuring that there is no particular prejudice visited on U.S. creditors by requiring them to assert their claims in the Cayman Islands proceeding (§ 304(c)(2)). *See In re Gee*, 53 B.R. at 903.

■ A similar approach might be employed with respect to the liquidators' request for turnover, except that the request in the § 304 petition is so generic that it is nearly impossible to evaluate against the § 304(c) standards. Unlike the targeted turnover request in *Gee*, the liquidators have here asked for little more than the authority to obtain turnover, as opposed to the affirmative turnover of any specific property from any specific entity. The statute is clear that the § 304(c) standards are to be used with respect to all relief sought under § 304(b), so the liquidators cannot get "pre-turnover" authority, followed by a request for turnover. Instead, their turnover request must be sufficiently specific that the court can determine whether, for example, the turnover if granted will require special protection of U.S. claim holders against prejudice and inconvenience in the processing of their claims in the foreign proceeding. Even though the court already knows that creditors will not suffer prejudice in a Cayman Islands proceeding by virtue of their being

**19.** In a nutshell, a court's effective jurisdiction expires at its own national borders. Actors outside that court's jurisdiction can thus act with near impunity as to assets beyond the court's jurisdiction. Only a local stay or injunction in the country where the assets and/or actor are located can effectively restrain self-help activity that tends to undermine equality of distribution.

**20.** This element should not be too strictly read. *See Petition of Brierley* 145 B.R. 151, 166 (Bankr.S.D.N.Y.1992) (holding distributive scheme under foreign bankruptcy law does not have to wholly replicate distributive scheme under the Bankruptcy Code in order for relief to be appropriate under statute governing cases ancillary to foreign proceedings; all that is required is that the distributive scheme under the foreign bankruptcy law be substantially in accordance with the distributive scheme employed under the Bankruptcy Code). It would be a mistake to construe this provision to mean that a court must find effective congruence between the distribution schemes of the United States and the country in which the foreign proceeding is pending. The problem with such an approach is that every country has its own scheme of priorities, reflecting local public policy choices that may or may not be shared by other countries. One country may give priority to internal tax claims but not external tax claims. Another might give superpriority to labor claims, priming even secured lenders. Yet a third may give special treatment to social claims enforced by governmental entities. Were one to insist on congruence, it is doubtful that any court would ever find it appropriate to grant relief under § 304(b). Congress can be fairly presumed to have been familiar with the wide variety of distributional schemes worldwide. Its provision should not therefore be construed to effectuate an intent clearly at odds with structure and overall purpose of section 304—to provide a mechanism for cooperation with foreign proceedings. *See generally Shultz v. Louisiana Trailer Sales, Inc.*, 428 F.2d 61, 65, (5th Cir.1970) (statute susceptible to various interpretations must be read in the manner which effectuates rather than frustrates legislative intent.)

"foreign creditors," the court cannot currently evaluate whether a given creditor's preferential rights in a given piece of property under U.S. law would be protected once the property left the United States, without first seeing what property is sought, from whom it is sought, and what special claims a U.S. creditor might have on that property.

Fortunately, the liquidators in this case are pursuing a more specific turnover request by way of the adversary proceeding now pending against Zollino and others. Rather than evaluate the request here, the court will apply the § 304(c) guidelines to the turnover request in the adversary proceeding itself.

The third request, seeking "other appropriate orders," is also impossible to evaluate using the section 304(c) guidelines, as it lacks specificity. The liquidators are certainly free to pursue further requests for more specific relief within the context of this section 304 action, as has been earlier suggested. As the case progresses, there may well be other needs that emerge, and this ancillary case provides the liquidators with a ready vehicle. Until more specific requests are made, however, it is neither necessary nor appropriate to grant the "generic" request for "other appropriate orders." The liquidators need no more authority to pursue such requests than that already afforded in the statute. Indeed, absent something more specific, the current request is not yet justiciable because it is not yet ripe for adjudication. *See In re Davis,* 191 B.R. 577, 583 (Bankr. S.D.N.Y.1996) (to be ripe, a case must present a real, substantial controversy between parties having adverse legal interests, and the dispute must be concrete and definite, not just hypothetical or abstract).

### Conclusion

For the foregoing reasons, an order will be entered denying the motion to dismiss this ancillary case, granting a stay, and denying the request for turnover and for other appropriate orders, without prejudice to the liquidators pursuing the request for turnover currently incorporated in the adversary proceeding, and without prejudice to the liquidators seeking, by later application, such other appropriate orders as they may deem necessary.